103 So.2d 19

**Buford JAMES et al.**

v.

**A. W. TODD, as Commissioner of Agriculture and Industries of the State of Alabama.**

**3 Div. 769.**

Supreme Court of Alabama.

Aug. 22, 1957.

Rehearing Denied June 5, 1958.

———◇———

Bowers, Dixon, Dunn & McDowell, Birmingham, and Sol E. Brinsfield, Jr., Montgomery, for appellants.

Joe T. Patterson, Atty. Gen., and W. E. McIntyre, Jr., Sp. Asst. Atty. Gen., for State of Mississippi, intervener.

John Patterson, Atty. Gen., Gordon Madison and Geo. O. Miller, Asst. Attys. Gen., for appellee.

Walter P. Gewin, Tuscaloosa, and Watkins C. Johnston, Montgomery, amici curiæ, in support of appellee.

MERRILL, Justice.

This is an appeal from a decree of the Circuit Court of Montgomery County, In Equity, holding constitutional Act No. 570, Acts of Alabama 1955, page 1239, listed as Tit. 22, §§ 231(6)–231(13), Pocket Part, Code of 1940.

The action was brought by one Tennessee and five Mississippi milk producers. It is a class action on behalf of other milk producers in those States who engage in the business of producing and selling milk to distributors who later sell and distribute milk and milk products in the State of Alabama. The bill of complaint asks for a declaratory judgment holding Act No. 570 unconstitutional and void. In addition, the bill prayed for a temporary restraining order pending decision and for a permanent injunction. A temporary restraining order was issued by Judge Jones on the date of the filing of the bill against the Commissioner of Agriculture and Industries, restraining him from enforcing the provisions of Act. No. 570. This restraining order remained in effect during the pendency of the action and until the rendering of the decision by the trial court.

After the filing of the bill, the State of Mississippi was allowed to intervene as a party complainant.

The bill was amended several times and ultimately a hearing was had on the bill as amended and the respondent's answers. Considerable testimony was taken either ore tenus or by deposition on behalf of the complainants. The respondent offered no evidence. The decree of the trial court held Act. No. 570 to be constitutional and

dissolved the temporary restraining order to be effective ten days after the date of the decree. Within that ten days, complainants applied for and obtained a reinstatement of the temporary restraining order from this court pending our decision in the cause.

The contentions raised by the assignments of error may be grouped as follows:

1. The Act is unconstitutional because it violates appellants' rights under the Fourteenth Amendment (the privileges or immunities, the due process and the equal protection clauses).

2. The Act is unconstitutional because it violates Section 2 of Article 4 of the Constitution of the United States, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens of the several States.

3. The Act is unconstitutional because it violates the Commerce Clause of the Constitution of the United States Const. art. 1, § 8, cl. 3.

4. The rules and regulations promulgated by the Department of Agriculture and Industries under the law are unconstitutional.

5. The court erred in refusing to permit appellants to introduce testimony by members of the Legislature to show the intent and history of the legislation, the circumstances surrounding its adoption and the evil thereby sought to be remedied.

The question presented to us is whether or not Act. No. 570 is unconstitutional on its face. The only action taken by the respondent Todd, as Commissioner of Agriculture and Industries, under the Act was to promulgate the rules and regulations as provided in the Act. There has been no application or enforcement of the Act or of the rules and regulations because the Commissioner has been under injunction continuously and has been prevented from enforcing, applying or administering the Act.

Section 1 of Act No. 570 expressly states and declares its purpose:

"The purpose of this Act is to more effectively utilize the existing agencies or departments of the State of Alabama in regulating production, processing, and distribution of milk and milk products to the end that the inhabitants of this State will be supplied with a wholesome and healthful supply of milk, cream, milk products, and by-products thereof. It is, therefore, declared to be in the public interest that milk and milk products be produced, processed, and distributed and otherwise handled under requirements as hereinafter provided for and as otherwise provided by law."

Section 3 is, in part, as follows:

"No milk shall be shipped or transported into the State of Alabama from another state unless such milk is produced and handled under sanitary conditions no less adequate in protection of public health than milk produced in the State of Alabama and authority for shipping or transporting such milk into the State of Alabama must be authorized by permits as provided in Act No. 65, Legislature of 1955 (2nd Special Session) and must be authorized by permit by the Commissioner of Agriculture & Industries and said Commissioner is hereby authorized to issue or revoke such permits as have been issued by the Commissioner of Agriculture under rules and regulations adopted under the provisions of this Act providing for a method of ascertaining the conditions under which such milk shipped into the State of Alabama was produced and handled. * * *."

This is not a situation where a State statute must fall because Congress chose to exercise its paramount power to regulate commerce under that part of the Constitution of the United States which

provides that the Congress shall have power to regulate commerce among the several States. Congress has not chosen to act in this field but, on the contrary, as stated in Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 530, 83 L.Ed. 752, "* * * in matters requiring diversity of treatment according to the special requirements of local conditions, the states remain free to act within their respective jurisdictions until Congress sees fit to act in the exercise of its overriding authority. One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens." In the Eisenberg case, the Supreme Court of the United States recognized that the milk business is essentially local and, therefore, subject to the police power of the State. Early in the history of our country, Chief Justice Marshall said, speaking of inspection laws, that such laws are "a portion of that immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government: all of which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, * * * are component parts of this mass." Gibbons v. Ogden, 9 Wheat. 1; 6 L.Ed. 23.

■■■ Under its police power, the State of Alabama is authorized to enact laws designed to protect the health of its citizens and more particularly where milk is concerned because of its nutritional importance to human beings and because of its susceptibility to contamination. Franklin v. State, 232 Ala. 637, 169 So. 295; Taylor v. State, 237 Ala. 178, 186 So. 463. The Legislature may even grant to a municipality the power to provide health regulations. Gilchrist Drug Co. v. City of Birmingham, 234 Ala. 204, 174 So. 609, 111 A.L.R. 103; Walker v. City of Birmingham, 216 Ala. 206, 112 So. 823. That adequate inspection laws are imperative is obvious in view of the fact that Alabama imports from Mississippi alone approximately fifty-two million pounds of milk annually.

Prior to 1955, there was no state agency with power to enforce health regulations pertaining to the handling, processing and production of milk within the State. The standards varied from county to county and the enforcement was at a local level. In the second extraordinary session of the 1955 Legislature, Act No. 65, Acts of Alabama 1955, p. 176, approved April 13, 1955, listed as Tit. 22, §§ 231(1)–231(5), Pocket Part, Code 1940, changed this status and provided for uniformity of enforcement. Under Act No. 65, no milk producer or distributor in Alabama or out of the State was permitted to do business in Alabama without first securing a joint permit from the state and county boards of health. Act No. 570 did not become effective until October 9, 1955.

■ It should be noted that the quoted part of Section 3 of Act No. 570 shows that the permits required under that Act are in addition to the permits required under Act No. 65, and all of the provisions of Act No. 65 remain in full force and effect.

Appellants urge that Act No. 570 is unconstitutional in many of the respects indicated in the assignments of error because it applies only to milk produced outside Alabama, and does not apply to local and out-of-state milk as does Act No. 65.

Appellants rely on several cases which hold in effect that one State may not, under the guise of exerting its police power, discriminate against products of other States by requiring permits under inspection laws. These cases are distinguishable from the instant case in that they deal with the administration or enforcement of their respective statutes and not with the statute as viewed in the abstract or on its face. As previously noted, there has been no enforcement of Act No. 570 or of the rules and regulations promulgated thereunder.

Examples of the cases cited by appellants are:

Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 9 L.Ed. 329, where the appellant was denied a license to sell its milk products within Madison, Wis., solely because its pasteurization plants were more than five miles away.

Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865, where the appellant was denied a license to operate a receiving depot where it took raw milk from farmers even though it met the requirements of the statute.

Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A. L.R. 55, where the appellant was denied a license as a milk dealer in New York City because it purchased milk produced in Vermont cheaper than the minimum price set for milk produced in New York State.

Miller v. Williams, D.C., 12 F.Supp. 236, where plaintiff, a manufacturer of ice cream in Philadelphia, was notified that his product could only be sold in Baltimore when there was a shortage of local ice cream since the contested regulation prohibited the sale of cream where it was produced from dairies more than fifty miles distant from Baltimore except in cases of emergency (a shortage of local cream).

Brimmer v. Rebman, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862, where Rebman was convicted under a statute which forbade the selling of fresh meat in Virginia which had been slaughtered more than one hundred miles from the place it was offered for sale. The meat Rebman sold had been slaughtered in Illinois by his employer, Armour & Co.

State of Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455, where Barber was convicted under a Minnesota statute for selling fresh meat in that state which had been slaughtered in Illinois, the statute having the effect of limiting sales of all fresh meat to that slaughtered in Minnesota.

Best & Co. v. Maxwell, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed 275, where the appellant paid under protest a tax required of one, not a regular retail merchant in the state, who displayed samples in temporary quarters.

Voight v. Wright, 141 U.S. 62, 11 S.Ct. 855, 35 L.Ed. 638, which was a suit to recover a license fee charged under a statute providing for inspection of flour shipped into Virginia when no inspection was required of flour manufactured in Virginia.

The reason for striking down the legislation in the foregoing cases was that the conditions imposed by the various statutes or ordinances made it practically impossible to import the goods into the State. Act No. 570 does not prevent out-of-state producers from shipping their milk into Alabama. The real requirement that they must meet is a reasonable one—that "such milk is produced and handled under sanitary conditions no less adequate in protection of public health" than milk produced in Alabama. Since Act No. 570 has never been put into operation, it cannot be said that there has been any improper application of its provisions and requirements, except as to the rules and regulations promulgated under it. The Supreme Court of the United States has said with regard to cases of this nature that "the controlling test is found in the operation and effect of the statute as applied and enforced by the state." Gregg Dyeing Co. v. Query, 286 U.S. 472, 52 S.Ct. 631, 633, 76 L.Ed 1232. The rules and regulations are reasonable and we do not understand that appellants seriously contend that the rules and regulations are unconstitutional if the Act is valid.

Appellants insist that Act No. 65 provides for an adequate inspection by the inspectors of the state and county health departments, and that the inspection by the Department

of Agriculture and Industries of out-of-state milk producers not only discriminates against them, but is a burden on interstate commerce.

The State Health Department has only five statewide inspectors, and it is their duty to inspect both Alabama and out-of-state producers and shipments under Act No. 65 and the rules and regulations under that Act. Each of Alabama's sixty-seven counties has a county health department and sixty-four counties have sanitarians or sanitary officers who check and inspect dairies in their respective counties. The three counties without sanitarians have little or no dairy industry. The work of the county sanitarians is checked by the five statewide inspectors. It is immediately apparent that milk produced in Alabama is inspected at both the local and the statewide level and the local inspectors are on the ground and their territorial limit is sufficiently small to make the inspection adequate. According to the evidence, there is no organization in the State of Tennessee to provide local inspection. It is undisputed that some out-of-state producers were stopped from shipping milk into Alabama after the passage of Act No. 65 and Act No. 570, based upon inspections of health department inspectors.

In view of the great quantity of milk imported into Alabama, we cannot agree that the furnishing of additional inspectors to inspect conditions under which out-of-state milk is produced is either discriminatory, arbitrary or so burdensome upon interstate commerce as to render the Act in question unconstitutional. Their sole objective should be to insure that out-of-state milk which is shipped into Alabama is produced under sanitary conditions no less adequate than that produced in Alabama. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of congressional power merely because it incidentally or indirectly involves or burdens interstate commerce. Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; Mintz v. Baldwin, 289 U.S. 346, 53 S.Ct. 611, 77 L. Ed. 1245; Asbell v. State of Kansas, 209 U.S. 251, 28 S.Ct. 485, 52 L.Ed. 778; Reid v. State of Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108.

The appellants seem fearful of what the Commissioner *might* do under Act No. 570. One of their main concerns centers around the provision in Section 6 of the Act which provides that permits shall be issued on a semi annual basis. Appellants insist that the permit should be on an annual basis. To more fully understand appellants' contention, it is necessary to give a brief background on the operation of the dairy businesses in question.

The supply of milk and its cost of production varies with the time of year. At the season of greatest production, the consumer demand is the lowest. In view of these facts, a system has been worked out which will insure that the distributor gets enough milk during the scarce season to supply the public demand, and in return that the producer, during the flush season or season of greatest milk production, will have a market for his milk and receive a fair price therefor. All the producer-complainants are on a system called the "plant usage basis." This means that for each producer, there is established a quota (i. e., that amount of milk for which the producer will be paid the top price). This quota is established as the ratio of the amount of milk the producer sells to the distributor to the total amount of milk purchased by the distributor during the base or quota making period—September through February, when the supply of milk is scarcest. This ratio is then applied for the next twelve months to the distributor's sales of fluid milk for human consumption (called Class I sales). For example, suppose the distributor purchases a total of 100,000 pounds of which producer A supplies 10,000 pounds—A's quota is ten per cent. That means that for the next

year, beginning March 1st, the producer receives the base price for ten per cent of the Class I sales made by the distributor to whom he sells his milk. Assume that Class I sales for any pay period (which is usually two weeks) are 100,000 pounds and producer A furnished 15,000 pounds. He receives the base price for 10,000 pounds and the surplus price for 5,000 pounds. Surplus milk is that used for the production of milk by-products, such as cheese, butter and ice cream. It is sufficient to say that a substantially less price is paid for this milk even though it may be the exact quality of milk which is used for drinking purposes. (For a similar explanation, see Attorney General Quarterly Reports, Volume 67, April–June, 1952, pages 47 and 48.) The theory behind this system of establishing quotas is to stabilize the economy of the milk business.

▇▇▇▇ Appellants introduced testimony to the effect that it is not possible for a producer to stay in business as a producer of Grade A milk unless he is able to make his calculations on the basis of an annual quota. Conceding this, we fail to see the logic of appellants' arguments that since the permit under the Act is only of six months' duration that it will necessarily keep them from shipping milk into Alabama. The producer can still make his calculations on an annual basis and as long as the producer complies with the health regulations of Alabama, the Commissioner of Agriculture and Industries must continue to issue him a permit every six months. As to the initial permit, Section 7A of the Act provides that anyone holding a permit under the authority of Act No. 65 shall be entitled to receive one from the Commissioner, and the Commissioner shall have no authority to revoke such permit until an inspection of the premises has been made. The permit can only be revoked for violations of rules and regulations promulgated under the Act; the revocation must be in writing and any person deeming himself aggrieved by any action of the Commissioner under the Act,

has a right to appeal to the Circuit Court of Montgomery County. The mere fact that the Commissioner *might* refuse to reissue a permit does not present this court with a justiciable question. In Highland Farms Dairy, Inc., v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 553, 81 L.Ed. 835, a case involving the validity of a milk control board, it was said:

" * * * One who is required to take out a license will not be heard to complain, in advance of application, that there is danger of refusal. (Citing authorities.) He should apply and see what happens."

In Smith v. Cahoon, 283 U.S. 553, 51 S. Ct. 582, 585, 75 L.Ed. 1264, the Supreme Court declared:

" * * * The appellant did not apply for a certificate, and the principle is well established that, when a statute, valid upon its face, requires the issue of a license or certificate as a condition precedent to carrying on a business or following a vocation, one who is within the terms of the statute, but has failed to make the required application, is not at liberty to complain because of his anticipation of improper or invalid action in administration. * * *"

The principle is otherwise stated—" * * * We are not justified in declaring a statute unconstitutional merely because it offers an opportunity for abuses. * * *" State ex rel. Hannah v. Armijo, 38 N.M. 73, 28 P.2d 511, 516.

▇▇▇▇ This court has, on many occasions, stated its position with regard to the interpretation of legislative enactments. We can only learn what the Legislature intended by what it has said, and have no right to stray into mazes of conjecture for an imaginary purpose in construing a statute, and where the language of a statute is unambiguous, the clearly expressed intent must be given effect, and there is no room for construction. State v. Bay

Towing & Dredging Co., 264 Ala. 187, 85 So.2d 890. Even when construction is necessary, our cases reaffirm the principle that where a statute is capable of two constructions, one which renders it valid and the other invalid, the construction which will uphold its validity must be adopted. Norton v. Lusk, 248 Ala. 110, 26 So.2d 849, 4 Ala.Dig., Constitutional Law, ⚖48. The principle is universal that legislation must be taken to be valid unless the contrary is made clearly to appear. Reid v. State of Colorado, 187 U.S. 137, 47 L.Ed. 108, 23 S.Ct. 92; State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 489, 121 A.L.R. 283. The principle is stated in the latter case, by Justice Gardner, as follows:

"Or to state it differently, all that the legislature is not forbidden to do by the organic law, state or federal, it has full competency to do. And in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a co-ordinate branch of the government. All of which is embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond a reasonable doubt that it is violative of the fundamental law. Gray v. Johnson, 235 Ala. 405, 179 So. 221; Walden v. City of Montgomery, 214 Ala. 409, 108 So. 231; Miller v. Marx, 55 Ala. 322."

Appellants have well stated the proposition in their brief as follows:

"There is no question but that in establishing, under the police power, a system for the inspection and control of milk, there is permitted, in the form of control, a difference as between milk produced in Alabama and milk produced in our neighboring states of Mississippi and Tennessee or in the Chicago milk shed, and brought into the State of Alabama in interstate commerce. The validity of the form of such control as applied to out-of-state milk depends on whether it is a reasonable system established actually as a safeguard of the public health or a system the intent and effect of which prevents importation of out-of-state milk in competition with the local supplies. The former is upheld, the latter stricken down."

■ We think we have shown by the foregoing that the Act, on its face, is reasonable and that the intent and the effect of the Act, on its face, is not to prevent the importation of out-of-state milk in order to eliminate competition with local supplies.

■ In holding that Act No. 570 is not violative of appellants' constitutional rights, we wish to make it clear that while we do not agree with appellants' construction of a part of Act No. 570, we also warn that an attempted enforcement of the Act under such a construction would render such action under the Act unconstitutional. The pertinent part of appellants' brief states:

"Act No. 65 provides that permits from the Health Department must be secured by the out-of-state producer who engages in the *production of milk for shipment* into the state; under Act No. 65 producer-complainants can qualify and secure the necessary Act No. 65 permit. But Act No. 570 (the Todd bill) does not provide for a permit for *production for shipment,* but limits its permits to the *actual shipment and transportation.* Under Act No. 570, therefore, the producer who does not ship, but sells his milk to the distributor out of state, cannot secure a Todd permit, Todd cannot issue one; yet unless the producer has a permit, the milk in the shipment of which his is a part is to be seized and condemned. No distributor can ship or transport it into Alabama, hence no distributor can buy it (Act No. 570, Code of 1940, Tit.

22, Secs., 231 [6–13, inc.] Pocket Part). Act No. 570 is, therefore, an absolute barrier to the sale in Alabama of milk produced by producer-complainants out-of-state."

We cannot agree that Act No. 570 limits its permits to the actual shipment and transportation of milk, rather, we think the Act and the rules and regulations promulgated thereunder contemplate the issuance of a permit to any out-of-state producer whose milk is shipped or transported into Alabama.

The last grouping of the assignments of error relate to the action of the trial court in refusing to permit the introduction of testimony of four members of the Legislature concerning the consideration and passage of Act No. 570 by that body.

The questions to and the answers of the witnesses clearly show an attempt to have them express their conclusions as to the motive, purpose and intent of the Legislature in passing the Act, and to show that such were different from that expressed in Section 1 of the Act. In Morgan County v. Edmonson, 238 Ala. 522, 192 So. 274, 276, this court said:

"It is of course a well settled rule that in determining the validity of an enactment, the judiciary will not inquire into the motives or reasons of the legislature or the members thereof. 16 C.J.S. Constitutional Law § 154, p. 487. 'The judicial department cannot control legislative discretion, nor inquire into the motives of legislators.' City of Birmingham v. Henry, 224 Ala. 239, 139 So. 283. * * *"

See, also, May v. Head, 210 Ala. 112, 96 So. 869. The following from Wiseman v. Madison Cadillac Co., 191 Ark. 1021, 88 S.W.2d 1007, 1009, 103 A.L.R. 1208, is applicable:

"The appellee introduced Senator E. B. Dillon, a member of the Fiftieth General Assembly, who testified with reference to holding meetings and what the purpose of the amendment was, and testified at length about the passage of the bill through the Senate. He testified about his understanding of the intention of the Legislature and the intention of the committee in adopting section 15 as it now appears in the act.

"The court held that the evidence offered was incompetent and therefore did not consider it. * * *

"The chancery court was correct in holding the evidence introduced by appellee incompetent.

"The intention of the Legislature, to which effect must be given, is that expressed in the statute, and the courts will not inquire into the motives which influenced the Legislature or individual members in voting for its passage, nor indeed as to the intention of the draftsman or of the Legislature so far as it has not been expressed in the act. So in ascertaining the meaning of a statute the court will not be governed or influenced by the views or opinions of any or all of the members of the Legislature, or its legislative committees or any other person."

See 2 Sutherland, Statutory Construction, § 5011, 3d Ed.; 82 C.J.S. Statutes § 354, p. 745.

The trial court correctly sustained the objections to the testimony of the members of the Legislature.

It follows that the decree of the lower court should be affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.