DAIRYMEN, INC., et al., Plaintiffs,

William J. Baxley, etc., Intervening Plaintiff,

v.

ALABAMA DAIRY COMMISSION et al., Defendants.

Civ. A. No. 77–445–N.

United States District Court, M. D. Alabama, N. D.

Dec. 27, 1977.

D. Paul Alagia, Jr., and Charles L. Owen, Louisville, Ky., Thomas S. Lawson, Jr., Montgomery, Ala., for Dairymen, Inc.

Erle Pettus, Jr., Birmingham, Ala., for Farmbest.

Benjamin Cohen, Asst. Atty. Gen., Montgomery, Ala., for William J. Baxley, Atty. Gen. of the State of Alabama, Montgomery, Ala., intervening plaintiff.

Robert M. Alton, Jr., Montgomery, Ala., for Alabama Dairy Commission.

Henry C. Chappell, Jr., Montgomery, Ala., for Associated Milk Producers.

## MEMORANDUM OPINION

VARNER, District Judge.

This cause is submitted on the pleadings and evidence offered at trial and the briefs of all parties for final judgment. This Court takes jurisdiction under 28 U.S.C. §§ 1331, 1332.

The issues now before the Court are whether Order 3–75–1 of the Alabama Dairy Commission [1] is repugnant to the commerce clause, the due process clause or the equal protection clause of the United States Constitution.

Order 3–75–1, sometimes referred to as the quota regulation, provides that each distributor of Class 1 milk within the State of Alabama must purchase that percentage

---

1. The Alabama Dairy Commission operates under statutory duties, Code of Alabama, 1975, § 2–13–40, et seq., and has promulgated its regulations thereunder.

of its Class 1 milk marketed within the State of Alabama, if available, from a producer holding a quota in that distributor's milk marketed within the State of Alabama. In order to maintain his quota, the producer is required to furnish each month at least 110 percent of his quota—that is, his assigned percentage of the milk marketed by the distributor to consumers within the State of Alabama. The producer's quota is the ratio of the Class 1 milk delivered to the distributor by the producer to the amount of the Class 1 milk marketed by the distributor to consumers in the State of Alabama for a quota-fixing time period during the fall and winter when cattle feed and resulting milk is in short supply. To illustrate, if Producer A sold Class 1 milk to Distributor B for resale in Alabama, and A furnished five percent of the Class 1 milk sold by B in Alabama within the quota-establishing period, A would hold a quota and be entitled to sell to B at least five percent of the milk marketed by B in Alabama during the following period.

## BURDEN ON INTERSTATE COMMERCE CLAIMS

In this Court's opinion, the most persuasive of the Plaintiffs' challenges of the constitutionality of the quota regulation is based on the commerce clause as applied in the cases spawned by the Supreme Court opinion in *Baldwin v. Seelig*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).[2] The holding of *Baldwin* was most recently recognized in the 1964 case of *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964).

The Court in *Polar* held unanimously that the statutes and regulations of the State of Florida, reserving the local milk market for local producers, unconstitutionally burdened interstate commerce and appropriated power reserved to Congress under the commerce clause. Factually, *Polar* most nearly approaches the case at bar. There, the

Court considered the constitutionality of a Florida Dairy Commission regulation of dealings between milk distributors and milk producers located within the Pensacola, Florida, milk-marketing area that required Pensacola milk distributors to fill monthly sales in various milk grades or classes in proportions allocated to designated Pensacola producers. Each Pensacola producer with whom the distributor did business between September 1 and November 30 of each year (the base-fixing period) was assigned an earned base (quota) representing the ratio of milk delivered by the producer to the total milk delivered by all of that distributor's producers during the base-fixing period. The resulting percentage would then be applied to the number of gallons of milk the distributor sells each month to determine the number of gallons in each classification for which each earned base producer must be paid at prices fixed by the Commission. The statute prohibited distributors from terminating business relations with producers with whom the distributor had had a continuous course of dealing, without proper notice and just cause. It provided further that refusal to accept milk tendered or offered for delivery by a producer in ordinary continuation of a previous course of dealings was ground for license revocation. Florida law has been construed to require Florida distributors operating in the regulated marketing area to accept all the milk tendered by his earned-base producers. A distributor was relieved of the obligation to purchase milk from earned-base producers only upon a showing of just cause, which was something more than merely a demonstration that the Commission's minimum prices were burdensome or that milk was available elsewhere at a lower price.

■ The Alabama regulation differs from the Florida regulation in the following respects: (1) the Pensacola distributor was regulated as to all milk distributed by it, while the Alabama distributor is regulated

2. *Hood & Sons v. DuMond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1948); *Dean Milk Co. v. Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1950); *Schwegmann Bros. v. Louisiana Milk Commission*, 365 F.Supp. 1144 (M.D.La. 1973), affm'd. 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279.

156

only as to that part of its total milk sales to Alabama consumers; (2) out-of-state producers' quotas in an Alabama distributor's sales are equivalent in value to in-state producers' quotas while out-of-state producers had no status under the Florida law; (3) the Florida regulation required distributors to take all milk which its producers offered, whereas the Alabama regulation requires that distributors take all milk offered by their producers not exceeding the percentage represented by the producers' quota of milk sold by it within the State of Alabama. The quota regulation in Alabama was designed to avoid regulation of interstate shipments in that a nonresident producer may hold a quota in an Alabama distributor's Alabama market, and a distributor's allotment of quota is unaffected by milk distributed outside of the State of Alabama unless the distributor so elects. Quota holders in Alabama-distributed milk are approximately 75 percent in-state producers and 25 percent out-of-state producers.

Perhaps another significant distinction from the case at bar is that the Court in *Polar* found that the Florida regulatory scheme "reserves to its local producers a substantial share of the Florida milk market" (375 U.S. at 375, 84 S.Ct. at 386). In the instant case, two expert witnesses, Mr. Moffitt and Mr. McGhee, both attorneys with much experience in dairy industries and who were familiar with the application of dairy regulations, indicated in their testimony that the Alabama regulations do not reserve to Alabama producers a substantial share of the Alabama milk market. Mr. McGhee testified that this was best illustrated by the statistics showing that out-of-state shipments into the State of Alabama, particularly those originating in Tennessee, have increased substantially since imposition of the new regulations. Mr. Moffitt testified that quotas to enter the Alabama market are equally available to nonresident as well as to resident milk producers. All milk producers, whether resident or nonresident, may enter the Alabama market by only two means: (1) by being allotted quota from the Alabama Dairy Commission upon loss of that quota by other producers or (2)

by buying quota from quota-holding producers. Mr. Moffitt further testified that he had personally dealt in the Alabama market on behalf of Mississippi producers some years ago and that those out-of-state producers were treated equally to Alabama producers.

Plaintiffs' brief, at page 6, points out that "(T)he licensed Alabama processor is required to purchase all raw milk utilized for fluid milk sales through quota holders at the Class I price as fixed by defendant ADC. In contrast, the licensed out-of-state processor is free to purchase raw milk from non-quota holders at a negotiated price." This effect of the regulation, while perhaps discriminating against in-state distributors, is no bar to interstate commerce—in fact, it may be argued to encourage an increase of milk shipments into the State of Alabama.

The Plaintiffs emphasize the elements of "perpetuity" and "grandfathering" as though the words themselves are evil. The propriety of these elements has long been recognized in several industries, particularly the cotton, peanut and grain industries, and acreage and crop allotments have been generally approved in view of the fact that, while they have been found to have some effect on interstate commerce, they did not constitute a burdensome effect on interstate commerce. In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Court approved a California statute stabilizing raisin prices and regulating the marketing of raisins by restricting price competition among the growers. That Court stated:

"The governments of the States are sovereign within their territory save only as they are subject to the prohibitions of the Constitution * * *. This Court has repeatedly held that the grant of power to Congress by the Commerce Clause did not wholly withdraw from the States the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken. (citations omitted) *A fortiori* there are many subjects and transactions of local concern not themselves interstate commerce or a

157

part of its operations which are within the regulatory and taxing power of the States, so long as State action serves local ends and does not discriminate against the commerce, even though the exercise of those powers may materially affect it."

It is, therefore, the opinion of this Court that Order 3–75–1 is not offensive to the commerce clause of the Constitution.

## EQUAL PROTECTION AND DUE PROCESS CLAIMS

The Plaintiffs insist that the Alabama regulations favor out-of-state distributors over in-state distributors such as Farmbest and, therefore, that the regulations violate the Plaintiffs' right to equal protection of the law and due process.

Dr. Ortego, the Vice President of Dairymen, Inc., complained of the effect of the regulation as follows:

"Number one is, it does not permit competition in this state * * * it closes an area once producers obtain a quota. * * * It is in perpetuity as long as they deliver to hold it. * * * Buyer has no choice as to his source of supply. He has no way to change * * * it discourages the development of an industry within the state and encourages the development of industry around it." Page 46, Ortego deposition.

" * * * it is discriminatory to certain producers and handlers * * *. They may perform here by selling to quota-holding groups during a period when it is critically short of milk; yet, they are denied any ability to obtain or maintain part of those Class I sales the rest of the year." Page 47, Ortego deposition.

The Plaintiffs further argue as follows: "Licensed out of state processors increased packaged milk sales in Alabama 115% in 1977 as compared with 1976. Licensees in state processor sales declined. Bulk raw milk from out of state producers was limited to import through quota holders. There are no regulatory restrictions against licensed out of state processors exporting milk into Alabama." Page 8 of Farmbest brief received by the Court on 12/5/77.

The Plaintiffs also argue that quota is frozen in the hands of established producers in Alabama, who obtained quota under previous regulations that advantaged in-state producers and, thus, that, under the present quota system, the Alabama producer has been "grandfathered" into holding a monopoly of the quota in Alabama-distributed milk.

The issue whether the Alabama regulation is repugnant to the due process and equal protection clauses of the United States Constitution has been previously addressed by a three-judge panel of this Court in *Baxley v. Alabama Dairy Commission*, 360 F.Supp. 1159 (D.C.Ala.1973). Citing *Polar Ice Cream & Creamery Co. v. Andrews*, supra, the Court stated simply that the due process claims were without merit. As to equal protection, the evidence before the Court was insufficient to support a holding that the statutory provision constituted a denial of equal protection. 360 F.Supp. at 1161, 1164.

The Supreme Court of the United States in *Milk Control Board v. Eisenberg Farm Products*, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939), upheld a Pennsylvania regulatory scheme that fixed a minimum price payable to producers by distributors operating milk receiving plants within the State of Pennsylvania for the purchase of milk for shipment to points outside the State. There, Justice Roberts' majority opinion explained:

"The purpose of the statute under review obviously is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania. Its provisions with respect to license, bond, and regulation of prices to be paid to producers are appropriate means to the ends in view."

The *Eisenberg* case is, therefore, authority that the appropriate-ends test required by the due process clause is not offended by a price-fixing scheme such as the Alabama regulation provides. It would, therefore, appear that the purposes of the Alabama

158

statute, when considered in the light of the testimony of expert witnesses from various parts of the country, tend to accomplish a legal end within the realm of constitutional propriety as to questions of due process of law and equal protection of the laws. Apparently, the efforts of the Alabama Dairy Commission to match production of milk with market needs and to equalize raw milk production cost for all handlers, in transactions occurring totally within the State of Alabama between quota holders (whether resident or nonresident) and distributors in Alabama (whether resident or nonresident) are appropriate subjects for State regulation.

The favorable comparison between the Alabama regulations and the Federal Marketing orders in effect in Georgia and other States also leads to the conclusion that no substantial question of due process or equal protection is presented by the Alabama regulation.

The United States District Court for the Middle District of North Carolina in *Southeast Milk Sales Association, Inc. v. Swaringen*, 290 F.Supp. 292 (D.C.N.C.1968), considered the constitutionality of North Carolina quota regulations similar to those here in question and determined that they were valid. This Court is of the opinion that that Court correctly applied constitutional principles to determine that the regulations in question were not repugnant to the Constitution of the United States. Accordingly, this Court is of the opinion that the Alabama regulation is constitutional and that judgment should be entered for the Defendants and costs taxed against the Plaintiffs.