**DAIRYMEN, INC. and Farmbest Foods, Inc., Plaintiffs-Appellants,**

**William J. Baxley, etc., Intervening Plaintiff-Appellant,**

v.

**ALABAMA DAIRY COMMISSION et al., Defendants-Appellees.**

No. 78–1087.

United States Court of Appeals, Fifth Circuit.

Nov. 20, 1978.

Rehearing and Rehearing En Banc Denied Jan. 10, 1979.

Thomas S. Lawson, Jr., Montgomery, Ala., D. Paul Alagia, Charles Owen, Louisville, Ky., for Dairymen.

Erle Pettus, Jr., Birmingham, Ala., for Farmbest.

George Beck, Benjamin Cohen, Asst. Atty. Gen., Montgomery, Ala., for Baxley.

Robert M. Alton, Jr., Montgomery, Ala., for Alabama Dairy Comm.

Rushton, Stakely, Johnston & Garrett, Henry C. Chappell, Jr., Montgomery, Ala., for Associated Milk Producers.

J. David Dyson, Asst. Atty. Gen., Atlanta, Ga., for State of Georgia, Commissioner of Agriculture.

Before COLEMAN, AINSWORTH and VANCE, Circuit Judges.

VANCE, Circuit Judge.

This is a suit for declaratory judgment brought under 28 U.S.C. § 2201. Plaintiffs seek a declaration that the Alabama milk quota regulations promulgated by the Alabama Dairy Commission (ADC) violate the commerce clause of the United States Constitution. Injunctive relief is also sought.

On August 31, 1977 Farmbest Foods, Inc. (Farmbest), a licensed Alabama milk processor, entered into a milk supply contract with Dairymen, Inc. (Dairymen), of Louisville, Kentucky, an agricultural producer cooperative that operates in the southeastern states. Under the terms of this contract, Dairymen was to supply the Class I fluid milk requirements of the Farmbest plant in Montgomery, Alabama, commencing September 12, 1977. As a licensed Alabama processor, however, Farmbest is subject to regulation by ADC.[1] Under existing ADC quota regulations,[2] Farmbest was required to purchase its Class I milk needs for sale within Alabama from its quota holder, Associated Milk Producers (AMP).[3] Since performance of the contract would in effect substitute Dairymen for AMP as its Class I milk supplier, Farmbest immediately notified AMP by letter that it had contracted with Dairymen and that after September 11, 1977, AMP's raw milk would no longer be needed at Farmbest's Montgomery plant. AMP filed a complaint with ADC alleging that the action of Farmbest violated ADC Order No. 3–75–1. ADC responded by seeking an injunction against Farmbest in Alabama state court to prohibit performance of the contract and to direct Farmbest to continue accepting raw milk from AMP. That suit was removed to the United States District Court but was dismissed following the entry of a stipulation that Farmbest would continue receiving milk from AMP under the requirements of the quota regulations until it was relieved by order of a court of competent jurisdiction.

Farmbest and Dairymen filed this declaratory judgment suit against AMP and ADC on September 13, 1977. On behalf of the people of Alabama William J. Baxley, Attorney General of Alabama, intervened on the side of plaintiffs. By leave of court, the Commissioner of Agriculture of the State of Georgia also participated as *amicus curiae* in support of plaintiffs. Following a trial on the merits, the district court entered judgment for defendants upholding the quota regulation of ADC. *Dairymen, Inc. v. Alabama Dairy Commission,* 449 F.Supp. 154 (M.D.Ala.1977). We reverse.

The act creating the Alabama State Milk Control Board was approved by the Governor of Alabama on July 9, 1935.[4] Section 1 of the act provided in part,

That the normal process of producing and marketing milk has come to be a cooperative industry of vast importance to the State and of vital interest to the consuming public, which ought to be safeguarded and protected in the public interest. That the present economic depression, through which we have been and are now passing, and the disparity of the prices received by producers and producer-distributors and the prices which such producers and producer-distributors are forced to pay for articles purchased, has broken down the orderly exchange of commodities produced and marketed by them for commodities purchased by them, has seriously impaired the assets of producers and producer-distributors and

1. The ADC is an authorized agency of the State of Alabama charged with the duty of regulating the milk industry in Alabama under Section 2–13–40 of the *Code of Alabama* (1975).

2. The Alabama milk industry has been regulated under quota regulations promulgated by ADC and its predecessor, Alabama State Milk Control Board, for over 35 years. The current quota regulation, ADC Order No. 3–75–1, challenged in this case, has been in effect since October 9, 1975.

3. Associated Milk Producers is a producer cooperative operating in Alabama, Tennessee, Georgia and Kentucky and holding almost 100% of the quota in the Montgomery processing plant of Farmbest. According to the joint brief of ADC and AMP, AMP's membership consists of 330 producers residing in Alabama, 140 producers in Tennessee, 20 producers in Mississippi, and 10 producers in Florida.

4. 1935 Ala.Acts 204.

dairy assets supporting the credit structure of this State and has created an emergency which the Federal Congress has recognized and has attempted to meet by Legislation, granting the Secretary of Agriculture certain powers relative to the production, sale and distribution of agricultural products including milk.

1935 Ala.Acts 204, 205. Although it was initially passed by the legislature as an emergency matter to expire by its own terms, the regulatory agency has survived most of its creators and lives on. In 1971 the name of the Board was changed to the Alabama Dairy Commission. The overall authority of the ADC and its predecessor has survived several prior attacks.[5]

The ADC was given the power to regulate the fluid milk industry in Alabama including the production, transportation, storage, processing, manufacture, distribution, delivery and sale of fluid milk products; to fix prices to be paid for fluid milk products; to determine the use that the distributor or processor makes of all fluid

milk purchased and to require payment for such milk at its proper price; and to designate milk marketing areas within the State. *Code of Alabama* § 2–13–47. Section 2–13–51 provides,

(c) The commission shall have the power to establish uniform rules and regulations for the apportionment of base milk quota among the various producers who furnish processors, distributors and milk dealers with their regular supply of milk, and the commission may adopt such systems for the apportionment of such base or higher price classification of milk among the several producers as it may determine to be the most just and equitable in the administration of this article.

Pursuant to this broad grant of power, the ADC has regulated the milk industry in Alabama under a quota system for over thirty-five years. A description of the regulatory system by the Supreme Court of Alabama is set out below.[6]

The current quota regulation, ADC Order No. 3–75–1, has been in force since 1975. Quota is defined as follows:

---

**5.** *Baxley v. Alabama Dairy Comm'n,* 360 F.Supp. 1159 (M.D.Ala.1973); *Alabama Dairy Comm'n v. Food Giant, Inc.,* 357 So.2d 139 (Ala.1978); *Dixie Dairies v. Alabama State Milk Control Board,* 286 Ala. 198, 238 So.2d 551 (1970); *Taylor v. State ex rel. Alabama State Milk Control Board,* 237 Ala. 178, 186 So. 463 (1939); *Franklin v. State ex rel. Alabama State Milk Control Board,* 232 Ala. 637, 169 So. 295 (1936).

**6.** The supply of milk and its cost of production varies with the time of year. At the season of greatest production, the consumer demand is the lowest. In view of these facts, a system has been worked out which will insure that the distributor gets enough milk during the scarce season to supply the public demand, and in return that the producer, during the flush season or season of greatest milk production, will have a market for his milk and receive a fair price therefor. All the producer-complainants are on a system called the "plant usage basis." This means that for each producer, there is established a quota (i. e., that amount of milk for which the producer will be paid the top price). This quota is established as the ratio of the amount of milk the producer sells to the distributor to the total amount of milk purchased by the distributor during the base or quota making period—September through February, when the supply of milk is scar-

cest. This ratio is then applied for the next twelve months to the distributor's sales of fluid milk for human consumption (called Class I sales). For example, suppose the distributor purchases a total of 100,000 pounds of which producer A supplies 10,000 pounds—A's quota is ten per cent. That means that for the next year, beginning March 1st, the producer receives the base price for ten per cent of the Class I sales made by the distributor to whom he sells his milk. Assume that Class I sales for any pay period (which is usually two weeks) are 100,000 pounds and producer A furnished 15,000 pounds. He receives the base price for 10,000 pounds and the surplus price for 5,000 pounds. Surplus milk is that used for the production of milk by-products, such as cheese, butter and ice cream. It is sufficient to say that a substantially less price is paid for this milk even though it may be the exact quality of milk which is used for drinking purposes. (For a similar explanation, see Attorney General Quarterly Reports, Volume 67, April-June, 1952, pages 47 and 48.) The theory behind this system of establishing quotas is to stabilize the economy of the milk business.

*James v. Todd,* 267 Ala. 495, 503–04, 103 So.2d 19, 25–6 (1957).

*Quota:* Quota is the proportionate share of the sales of a plant assigned to each producer assigned to the plant. Quota is the personal property of the producer and shall be registered in the office of the Alabama Dairy Commission. Every Regular Producer shipping milk to a processing and/or distributing plant in the Consolidated Milk Shed of Alabama shall have a quota calculated and assigned by the Alabama Dairy Commission.

*Id.* Quota is directly related to the amount of Class I milk marketed within the State of Alabama.[7] Each producer's quota is based on his percentage of the Class I sales of a plant during the quota building period.[8] To maintain quota, the producer must furnish at least 110% of his quota during the quota using period. Base is this percentage translated into pounds of milk to be delivered each month during the quota using period.

Individual producers and cooperative marketing associations are treated alike in holding quota. Both are required by Order 3–75–1 to deliver their base amount, and the distributors are required to accept the base amount tendered whether produced by the quota holder or otherwise acquired. The regulation is as follows:

IV. DELIVERY AND ACCEPTANCE REQUIREMENTS:

\*    \*    \*    \*    \*    \*

B. The total amount of milk to be delivered and accepted during a pay period shall conform to the following:
1. Producers, other than members of a cooperative marketing association, shall deliver within a pay period an amount of milk at least equal to their base for such period, if produced, and the distributor to which such base is assigned shall accept such an amount (whether produced by the producer or otherwise acquired by him).
2. A cooperative marketing association shall deliver within a pay period an amount of milk at least equal to the aggregated base of its members, if produced, and the distributor to which such aggregated base is assigned shall accept such an amount (whether produced by such members or otherwise acquired by the Association).

ADC Order No. 3–75–1.

Once a producer becomes a quota holder, he has the right to retain a percentage of each plant's Class I sales in perpetuity until the percentage is lost, sold or transferred. When quota is lost, 60% is reassigned to existing quota holders at the plant, and 40% goes to new producers.[9] The new producer is "one who produces milk for the first time, or one who changes from producing manufacturing milk to the production of Grade A milk, or one who has not produced Grade A milk for at least three years." ADC Order No. 3–75–1. Abandoned, unused or lapsed quotas are added together and divided among the producers then shipping to the distributor in accordance with their current quotas.

I.

It is appellants' position that, for all practical purposes, the Alabama regulation is identical to the Florida plan that was held

---

7. Class I milk is defined by the Alabama Dairy Commission to be all milk that is sold or used in fluid form within the State of Alabama. Section III.A. of ADC Order No. 3–75–1. Class II milk is that which is used in the plant for cottage cheese, soft serve mixes, sour cream, yogurt and similar products. Section III.C. of ADC Order No. 3–75–1.

Even though the raw milk is of identical quality, Class I milk commands a higher price than Class II milk. In 1977, for example, the Class I price was $11.75 per hundredweight while the Class II price was only $8.64.

8. The quota building period is the season when milk is in short supply, September through January of each year. The quota using period is from March through February of each year.

9. Section VII.B. of ADC Order No. 3–75–1 provides,

Sixty percent (60%) of the unearned quota (quota lost by producers failing to ship 110% of their Class I Entitlement) will be distributed March 1st to existing producers who qualify, and the remaining 40% will be distributed to new producers who qualify between March 1st and September 1st.

unconstitutional by the Supreme Court in *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964).[10] In a unanimous decision the Supreme Court found that

> The Florida controls preempt for the Florida producers a large share of the Florida market, especially the most lucrative fluid milk market. Out-of-state milk may not participate in this part of the Florida market, unless local production is inadequate, and given the exclusive domain of the Florida producers over Class I sales, out-of-state milk may not profitably serve the remainder of the Florida market, since it is relegated to the surplus market alone.

*Id.* at 376–7, 84 S.Ct. at 387. The court held that "These barriers are precisely the kind of hindrance to the introduction of milk from other States which *Baldwin* [*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)] condemned as an 'unreasonable clog upon the mobility of commerce.'" *Id.* at 377, 84 S.Ct. at 387. *Polar* also relied on *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) in which the Supreme Court struck down an ordinance prohibiting the sale of milk unless bottled within five miles of the center of Madison as it applied to an Illinois milk distributor. The court held,

> To permit Madison to adopt a regulation not essential for the protection of local health interests and placing a dis-

criminatory burden on interstate commerce would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.

*Id.* at 356, 84 S.Ct. at 299.

The ADC and AMP argue that the Florida provision struck down in *Polar Ice Cream & Creamery Co. v. Andrews, supra,* can readily be distinguished from the Alabama regulation. They rely on the court's finding that

> Polar may turn to out-of-state sources only after exhausting the supply offered by its Pensacola producers. Under the challenged regulations, an Alabama dairy farmer could not become one of Polar's regular producers and sell all of his milk to that company.

*Id.* at 376, 84 S.Ct. at 387. ADC Order No. 3–75–1 does not contain a requirement that Alabama distributors purchase their milk from Alabama sources until such sources are exhausted.[11] Appellees therefore contend that, because Farmbest is not restricted solely to Alabama producers, *Polar* is inapplicable.[12] They point to the evidence that 150 out-of-state producers regularly supply milk in Alabama through AMP, that a substantial number of Dairymen producer members live outside the State of Alabama and market milk as quota milk, and that twelve new producers from other states have entered the Alabama market as quota holders within the past three years.

**10.** Under the Florida plan the Florida Milk Commission assigned 100% of the raw milk needed for Polar's Class I sales to 26 Pensacola producers, set a minimum price that Polar was required to pay the assigned producers, forbade termination of the business relationship between Polar and its producers without just cause, and provided that refusal to accept the producers' assigned percentage was ground for revocation of the processor's license. *See Polar, supra,* at 363–70, 84 S.Ct. at 378.

**11.** The exhaustion of Alabama sources was required until Order No. 2–72–1 was issued by the ADC in October 1972.

**12.** The district court below noted several distinctions between the Alabama regulation and the Florida plan:

> (1) the Pensacola distributor was regulated as to all milk distributed by it, while the

Alabama distributor is regulated only as to that part of its total milk sales to Alabama consumers; (2) out-of-state producers' quotas in an Alabama distributor's sales are equivalent in value to in-state producers' quotas while out-of-state producers had no status under the Florida law; (3) the Florida regulation required distributors to take all milk which its producers offered, whereas the Alabama regulation requires that distributors take all milk offered by their producers not exceeding the percentage represented by the producers' quota of milk sold by it within the State of Alabama.

449 F.Supp. at 155–156. These distinctions, however, do not alter the result. As in *Polar* the effect of the Alabama quota regulation on interstate commerce is clear.

Alabama is a deficit state, and out-of-state milk has always been needed to satisfy in-state consumer needs. In 1972, the ADC altered its quota regulation to apply equally to out-of-state producers and in-state producers. The historic suppliers, both in-state and out-of-state, were assigned quotas representing the percentage of raw milk that they were regularly supplying the Alabama market. About 75% of the quota holders are in-state producers and approximately 25% are out-of-state producers. The quotas guaranteed these historic suppliers the right to furnish the Class I needs of the Alabama market in perpetuity. These quota holders are still providing the raw milk for Class I use and will continue to do so unless their quotas are lost. This reserves the lucrative Class I market exclusively for the historic suppliers.

Since quota is a percentage tied to sales, there is never a new quota at an existing plant. The Administrative Assistant of ADC testified that all Alabama producers, except those who traditionally serviced an out-of-state market, hold quota. He further stated that no supplemental milk is available from Alabama producers. A realistic look at the effect of ADC Order No. 3–75–1 compels the conclusion that Alabama's quota regulation reserves to historic Alabama producers a substantial share of the Class I milk market.

One aspect of the quota regulation reveals the unfairness of the Alabama system. By virtue of the "Delivery and Acceptance Requirements" of ADC Order No. 3–75–1 producers are allowed to engage in interstate commerce, negotiate for the purchase of raw milk and deliver this out-of-state milk to the processor as quota milk. The processor is forced to accept all quota milk tendered "whether produced by the producer *or otherwise acquired by him.*" *Id.* (emphasis added). Under this authority AMP has on numerous occasions purchased out-of-state milk to maintain its quota in Alabama processing plants.[13] AMP has thereby preserved its percentage of Alabama's Class I market even though it was unable to produce the base milk itself. With such a provision AMP need never lose its quota. The regulatory scheme thus incorporates an anomalous feature under which AMP is free to buy milk wherever it pleases outside Alabama at any price it pleases and to sell such out-of-state milk to Farmbest, but Farmbest is bound by a regulatory straightjacket that in effect requires it to deal only with AMP.

In *Polar,* the court held,

The principles of *Baldwin* are as sound today as they were when announced. They justify, indeed require, invalidation as a burden on interstate commerce of that part of the Florida regulatory scheme which reserves to its local producers a substantial share of the Florida milk market.

*Id.* at 375, 84 S.Ct. at 386. The impermissible burden is not significantly lessened by the reservation of the Alabama market to both historic in-state producers and a few historic out-of-state producers to the exclusion of all other producers in all other states.

## II.

*Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission,* 365

---

**13.** John E. Cagle, the General Manager of AMP, testified,

Q. And would you tell the Court the numerous places from which you are importing milk to hold quota in Alabama plants?

A. We import from Kentucky, Tennessee, North Carolina. We import from Wisconsin and that area.

.    .    .    .

Q. Mr. Cagle, can you tell us in May, which will be Exhibit 18, how much milk AMP imported and brought into Alabama to hold quota?

A. I believe this document says a million forty-two thousand one hundred and three pounds, sir.

Q. All right, and just to get the overall picture would you now turn to the September exhibit, which is Exhibit 21, and tell us the total amount you imported to hold quota in the month of September?

.    .    .    .

A. Seven to eight million pounds, yes, sir.

F.Supp. 1144 (M.D.La.1973), *aff'd*, 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974) makes clear that one state cannot fix the price of milk paid to out-of-state producers when title to the milk passes in another state. Since a producer must hold quota to participate in the Alabama Class I market and the regulation requires all purchases to be f. o. b. the processor's plant, the ADC assures that Alabama prices are paid in all Class I purchases. There simply can be no out-of-state purchase of raw milk for Class I use by the processor. This requirement of the Alabama regulatory scheme has a purely economic objective. The following observation from *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), is thus pertinent:

> This distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law.[14]

*Id.* at 533, 69 S.Ct. at 662.

In *Baldwin v. G.A.F. Seelig, Inc., supra,* the Supreme Court struck down legislation that denied appellant a license as a milk dealer in New York City because it paid less for milk produced in Vermont than the minimum price set for milk produced in New York State:

> New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there. So much is not disputed. New York is equally without power to prohibit the introduction within her territory of milk of wholesome qualify acquired in Vermont, whether at high prices or at low ones. . . .
>
> Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if custom duties,

equal to the price differential, had been laid upon the thing transported. . . .

> "It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business."

*Id.* at 521–22, 55 S.Ct. at 499 (citations omitted). Justice Cardozo's summary of the controlling principle also applies to the question before this court:

> [C]ommerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another . . . ..

*Id.* at 524, 55 S.Ct. at 501. We eschew what Cardozo referred to as the nice distinctions between direct and indirect burdens in interstate commerce. When it orders that all raw milk for Class I sales within Alabama be purchased inside the state at a fixed price, the ADC is indirectly regulating the price to be paid to the out-of-state producers. The obstruction to commerce between the states is as clear in this case as it was in the New York system struck down in *Baldwin, supra.*

### III.

To fully understand the evolution of the milk regulation cases since the 1930's one must consider changes in the stated facts; namely, historic changes in the marketplace and advances in transportation, communication and commerce. Yesterday's local dairyman who served a restricted community is not the typical subject of today's litigation. It is apparent that some regulators have not kept abreast of this changing reality. Emergency, depression regulatory schemes, which were of uncertain wisdom but were constitutionally permissible in another era under very different facts, will not pass muster when brought to bear against today's fast moving streams of interstate commerce. The fine line distinctions for which the regulators argue do not

---

14. With respect to the history of the commerce clause, Justice Jackson also said,

 No other federal power was so universally assumed to be necessary, no other state power was so readily relinquished.

*H. P. Hood & Sons, supra,* at 534, 69 S.Ct. at 663.

save their cause. Farmbest in Alabama is free to buy wholesome milk for resale in Alabama from Dairymen in Kentucky at whatever price is agreed upon between them. The State of Alabama has no power to restrict the purchase, prevent the resale or regulate the price.

ADC Order No. 3–75–1 and, as applied here, the Alabama statute conflict with the commerce clause of the Constitution and must fall. Appellants are entitled to both declaratory and injunctive relief in conformity with the conclusions herein expressed.

REVERSED and REMANDED.