Federated Guaranty Life Insurance Company appeals from a judgment in favor of the plaintiff, Painter, which reformed an employment contract between them and also granted incidental relief in the form of money damages for a breach of that contract as reformed. We reverse and remand.
Painter was first employed in September, 1965 as an agent by the defendant's predecessor, Cotton States Life Insurance Company. On June 9, 1969 he was promoted to the position of general agent, having been recruited by William Lanford, agency vice-president for the company. He signed a standard general agent's contract form.
This contract consisted of several parts, among them being a schedule which set forth the commissions to be received by a general agent according to plan of insurance and the first, second, and third through tenth years in which premiums were paid. It also listed the percentage of *Page 310 
the service fee to be allowed the general agent based upon renewal premiums paid during the third through tenth policy years, and the service fee allowed him after that period of time. For example, the schedule of commissions on a Whole Life policy with 20 or more annual premiums is shown as follows:
1st yr. 2nd yr. 3rd — 10th yrs. Service Fee
— ----- ------- --------------- -----------
 Commission Service Fee Total Thereafter
 ---------- ------- --- ----- ----------
80% 10% 5% 2 1/2% 7 1/2% 2 1/2%

The contract also contained a form pertaining to renewal rights. Because this is the contract provision whose terms are in issue, we set it out in haec verba:
 RENEWAL RIGHTS; if this Agreement is terminated by the Company or by the Agent or should the Agent die while this Agreement is in force or become totally disabled from its performance he, or in case of his death, his heirs or legal representatives shall, except as hereinafter provided in Paragraphs A, B and C, receive renewal commissions that accrue under the provisions of this Agreement relating to compensation, if any, less a service fee of 3% of each premium. In the event of termination of this Agreement, other than by death or disability, the maximum period during which renewal commissions shall accrue under the terms hereof shall not exceed an additional period equal to the period which the Agent has been under contract with the Company prior to such termination, provided the Agent has been under contract at least three (3) years from the date of the contract. At which time this vested portion of the contract is retroactive to the original date of contract.
 A. Renewal commissions shall not be payable after the termination of this Agreement if the Agent has misappropriated or failed to account for any of the Company's funds.
 B. If, after this Agreement is terminated, the Agent writes a new policy with another company to replace any policy in this Company, the Agent shall thereby forfeit all rights of this Agreement and renewal commissions shall not be payable thereafter.
 C. After the termination of this Agreement renewal commissions shall cease to be payable at the end of any calendar year during which renewal commissions received by or credited to the Agent average less than $25.00 per month.
It is important to observe, as the testimony also explained, that the commission schedule and the renewal rights clause dealt with different "service fees." In the former, the service fee is an amount paid to the general agent for servicing the policy, an amount in addition to the earned commission. The "service fee" referred to in the renewal rights clause, however, is a charge against the agent's commissions he is to receive following termination of his employment contract by death, total disability, or otherwise by either party.
Approximately one year after executing his contract Painter realized that the word "premium," as it appears in the renewal rights clause, should have been "commissions." He went to Lanford who told him that it would be changed in his contract to three per cent of the commission. In fact, the provision was not changed. Subsequently both Painter and Lanford left the employ of the company which later merged with Federated Guaranty and retained that name. Ultimately Painter brought an action against Federated for breach of contract in failing to pay the full commissions to which he was entitled. That action ended in a mistrial. Then Painter amended his complaint to request a reformation and incidental relief. That suit was heard by the trial court without a jury. Reformation was granted as requested.
The defendant's contention on appeal is that there was no clear, convincing and satisfactory evidence before the trial court proving that the written agreement executed by the parties did not reflect their intention at the time it was executed. In short, it maintains that there was absent in the trial court a sufficient showing of mutual mistake on which to base a reformation. *Page 311 
The right to have a court revise a written contract which through mutual mistake does not express the parties' intention has been recognized by statute since the Code of 1923, Code ofAlabama 1923, § 6825; Tit. 9, § 59, Alabama Code of 1940 (Recomp. 1958); Code of Ala. 1975, § 8-1-2, and earlier by decisions. Because there is a presumption which arises from the instrument itself that supports it as the true agreement,Marengo Abstract Co. v. C.W. Hooper Co., 174 Ala. 497,56 So. 580 (1911); 66 Am.Jur.2d § 117 at 643, our Court has cautiously placed the burden upon the reform seeker to prove his case by clear, convincing and satisfactory evidence. Great Atlantic Pacific Tea Co. v. Engel Realty Co., 241 Ala. 236, 2 So.2d 425
(1941). The quality of such evidence has been variously described, denoting the seriousness with which this Court has looked upon such a claim and its concomitant regard for the integrity of the written instrument. Thus we see expressions of Mr. Pomeroy adopted by this Court in Hammer v. Lange, 174 Ala. 337,340, 56 So. 573 (1911):
 `The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing — in the language of some judges, "the strongest possible" — or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. — 2 Pom.Eq.Jur. (3rd Ed.) § 859, p. 1515.
and that opinion added:
 This court has said: `To authorize the reformation of a contract which has been reduced to writing and signed, the proof must be clear, exact, and satisfactory, first, that the writing does not truly express the intention of the parties — that on which their minds had agreed; and second, what it was the parties intended the writing should express.' (citation omitted). Also: `If the proof is uncertain in any material respect, it will be held insufficient; and, while the courts may feel a great wrong has been done, they cannot grant relief by reason of uncertainty.' (citation omitted).
That description of the burden assumed by a plaintiff seeking reformation conforms to a principle applied in an earlier case,Page v. Whatley, 162 Ala. 473, 474, 50 So. 116, 117 (1909):
 Equity grants reformation of deeds only when error certainly appears, and never upon a mere probability or a mere preponderance of evidence. (citations omitted). . . .
Thus, as the Court recognized in Holland Blow Stave Co. v.Barclay, 193 Ala. 200, 69 So. 118 (1915), again citing Pomeroy:
 `It is evident that the only authority in the court is to reform the contract so as to express that which the parties agreed on. It cannot make a new contract for the parties, nor establish that as a contract between them, which it is supposed they would have made, if they had understood the facts.'
Since the plaintiff's basis for reformation is grounded upon a mutual mistake of the parties, he had the burden of proving by such evidence as would meet those tests that there had been a meeting of the parties' minds on his version of their contract at the time that contract was made. Behan v. Friedman,218 Ala. 513, 119 So. 20 (1928).
In his testimony Lanford described the life commission schedule and explained its computations, together with the application of a general agent's rights to renewal premiums. He explained that variances existed among companies pertaining to vested renewal rights, and that one of his responsibilities was to convince general agents of the advantages of these benefits over those of other companies. This particular provision was a part of the original contract existing when he became agency vice-president of the company. He testified that its effect as written (to allow the company to retain a larger sum for servicing the policy after the agent had terminated the employment agreement than the company would retain if it took that service fee from each commission) was first shown to him by a general agent named Carl. Lanford's testimony established that Carl complained to *Page 312 
him that the three per cent service fee deducted from renewal commissions would amount to more than the agent would earn in service fee commissions, and to an amount over fifty per cent of his renewal commission in the third through tenth years. Lanford's response to Carl, and to Painter shortly thereafter, was that the provision would be interpreted as three per cent of commission rather than three per cent of premium. Lanford's testimony also disclosed a variance in the terms of the vested renewal section of some of the agency contracts, for he changed the Carl contract from ten per cent of the renewal commission to three per cent. The Carl contract, he explained, had for some reason shown a "ten per cent override" as opposed to a "three per cent renewal commission on vested renewal." (An override, in insurance parlance, is an additional amount of commission based upon what an agent produces). The problem regarding the three per cent service charge on commission was also raised by an agent named Worsham, and Lanford executed a contract with him allowing the percentage of renewal commissions specified in the agency agreement less a service fee of three per cent of each commission. In addition, he and Mr. Boozer (company president) negotiated a new contract with an agent named Kubiszyn which involved changes in his commission schedule. He also referred to a memorandum he sent to Mr. Watkinson, another agent, pointing out that the three per cent service fee would be charged on commission. With regard to Painter's contract, his recollection was that he told Painter that [the clause in question] would be changed in his contract. "[i]t was not my intent," he testified, "that we take three per cent of the premium — it was three per cent of the commission."
He also referred to his instructions to the agency secretary to change this provision from three per cent of premium to three per cent of commission when the form contracts werereprinted and redesigned. He reiterated his assurance to Painter that his contract would be changed, but although it was his responsibility, it was not changed before he left the company in August, 1974.
Lanford conceded that the contract form setting forth the renewal rights was a printed form drafted by someone else and used by the company before he took his position with it. Also, he acknowledged that following his conversation with Mr. Carl he sought the advice of the company's actuary to determine whether there was enough profit in the policy by giving the agent the greater amount: ". . . I am making this change — do you see any objection?" He also established that the practice among companies varied, with some basing the service charge on premiums and some basing it on commissions. Additionally, he explained that the term "service fee" was used in two different ways, in one as a plus for the agent, such as an addition to him of a percentage of the premium, the percentage varying according to the length of employment, and as a collection charge against a terminated agent's vested renewal rights.
Painter himself testified that he signed the general agent contract forms, but he did not question Mr. Lanford about their contents. He did not, in fact, discuss any details other than the fact that the commissions were different from those he had earned as an agent, and his right to employ agents. It wasabout a year later when he learned from George Carl about thethree per cent charge. When he mentioned it to Mr. Lanford, he was told by him that it was supposed to be three per cent of commission and not premiums, and that "it was going to be three per cent of commission, that it would be changed when contracts were reprinted." On cross-examination he acknowledged a present awareness of the provision in his contract that all changes had to be in writing, but that Lanford had told him that the provision was not effective.
Taken as a whole, this evidence falls short of clearly establishing what Painter and Lanford agreed upon at the time the contract was made. It comes much closer to establishing what they would have agreed upon had they both considered the terms of the contract at the time it was executed and the implications it would have upon future eligibility for net renewal premiums. *Page 313 
What the evidence does show is that Painter entertained no intent at all upon that subject at the time the contract was executed. His intent was to sign a written contract which he had not read, the only terms of which discussed at that time being the commissions and the authority to employ agents. In fact, it is clear that Painter gave no thought to the question of vested renewal rights until a year after the contract had been executed. This hardly comports to a purpose, at the time of signing, to agree to a percentage of a service fee applied to commissions, and thus cannot support an inference that he made a mistake at that time, that is, that he misunderstood the terms, or made a wrong judgment. See Webster's New ThirdInternational Dictionary (G. C. Merriam Co., 1971) at 1446. Painter could not have misunderstood the terms unless he attempted to acquaint himself with them, nor could he have made a wrong judgment unless he had considered the alternatives at the time of execution.
Lanford's testimony regarding the contract terms was as prospective as it was retrospective. That is, having become familiar with those terms through later discussions with others, he resolved that they would be interpreted differently, and would be changed. This later awareness of terms which seemed to him to be unfair likewise does not clearly establish his intent at the time he executed the contract on behalf of the company, nor would his testimony have established, had it been allowed, that the provision as written did not reflect his intent during his discussions with Painter. This is because the subject in question was not discussed between them either before or during the execution and because, in fact, he did not draft the contract and was unfamiliar with these pertinentprovisions until almost a year following its execution byPainter. Even then it appears that Lanford's desire to amend its terms, assuming arguendo that he had authority to do so, was in his own mind prospective and subject to inquiry, for he sought information on the implications of such a change from the company's actuary. No inquiry would have been necessary if the contract expressed that change ab initio.
In fact, the renewal rights clause as written in the form contract is as restrictive to the agent as it is beneficial to him, for it severely limits the conditions under which the agent may receive those accruals. It is at least inferable that the language used in that clause was also intended by the company to limit the amount of those accruals as well.
Considering the entire record favorably to the plaintiff, nevertheless it appears to prove a later intention of the parties rather than an intention of the parties at the time they contracted. Behan v. Friedman, supra. There is an absence of that clear, convincing and satisfactory evidence which is required to overcome the presumption attending the deliberately written word, that most clear evidence which removes uncertainty about the parties' meaning. The evidence is equivocal, and being so it could not justify, on the ground of a mistake by both parties, the reformation decreed by the trial court which changed the words "of each premium" to the words "of each commission." It follows that the decree of the circuit court must be reversed and the case remanded, and it is so ordered.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.