MOORE, Special Justice
(dissenting).
I respectfully dissent.
These consolidated appeals involve the validity of objections filed by Carol M. Perdue, William D. Motlow, Jr., and Shane Sears to a class-action settlement agreement approved by the Montgomery Circuit Court (“the trial court”). In that settlement agreement, all contract holders in the Alabama Prepaid Affordable College Tuition (“PACT”) program and the bénefi-ciaries of those contracts agreed, among other things, to accept payment of college tuition and mandatory fees at a baseline established by 2010 tuition rates and to waive any statutory or contractual rights they may have that would be inconsistent with the terms of the settlement, specifically including any rights arising under the Wallaee-Folsom College Savings Investment Act (“the Act”), codified at § 16-33C-1 et seq., Ala.Code 1975. Perdue, Motlow, and Sears (sometimes hereinafter referred to collectively as “the objectors”) filed timely written objections to the settlement agreement, which contained a non-opt-out provision, and appeared, through counsel, at two fairness hearings conduct *364 ed on June 20 and July 15, 2011. Following the trial court’s approval of the settlement on July 27, 2011, the objectors filed two separate appeals; this Court consolidated those appeals on September 29, 2011.
The main opinion concludes that the judgment approving the settlement agreement should be vacated because it violates § 16-33C-19, Ala.Code 1975. I respectfully disagree. Section 16-33C-19 does not preclude the class members from waiving their rights or the PACT board from agreeing with the class members to a modification of the terms of their PACT contracts. Even if it did, the objectors do not have standing because they have failed to prove that they have been harmed by the settlement agreement. I also reject the objectors’ argument that, in amending the Act through Act No. 2010-725, Ala. Acts 2010, the legislature intended to guarantee full funding for the PACT Trust Fund. The objectors have failed to present any other ground for vacating the trial court’s judgment, and it should be affirmed.

I. § 16-33C-19 Does Not Preclude Waiver or Modification

A. Construction of § 16-33C-19

Section 16-33C-19 provides, in pertinent part:
“The Legislature strongly encourages the PACT board to make any financially beneficial changes to PACT rules, procedures, or policies, to the extent that the PACT board is authorized or permitted to make such changes and to the extent that such changes would not violate the contractual relationship existing between a PACT contract holder and the PACT board.”
By its plain language, § 16-33C-19 expressly forbids the PACT board from making “changes to PACT rules, procedures, [and] policies” that would “violate the contractual relationship existing between a PACT contract holder and the PACT board.” See IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992) (“[W]here plain language is used a court is bound to interpret that language to mean exactly what it says.”).
The first clause in § 16-33C-19 refers to “changes to ... rules, procedures, or policies” made by the PACT board, an agent of the State. See § 16-33C-5, Ala.Code 1975.
“ ‘We are to ascertain the true meaning of the Legislature in the use of the words of their statute, and we are to consider them, when legislating upon subjects relating to ... legal process, as speaking technically, unless from the statute itself it appears that they made use of the terms in a more popular sense.’ ”
Ex parte Western Union Tel. Co., 200 Ala. 496, 500, 76 So. 438, 442 (1917) (Sayre, J., dissenting) (quoting Merchants’ Bank v. Cook, 21 Mass. 405 (1826)). The Act vests the PACT board with the power “[t]o adopt the rules and regulations necessary to implement the provisions of [the Act] ...,” § 16-33C-5(2), Ala.Code 1975, and “to establish other policies, procedures, and criteria necessary to implement and administer the provisions of this chapter,” § 16-33C-5(11), Ala.Code 1975. Those terms — “rules and regulations” and “policies, procedures, and criteria” — carry definite and well understood legal meanings; thus, the “rules, procedures, or policies” to which § 16-33C-19 refers must be those adopted and established by the PACT board pursuant to § 16-33C-5.
Most state agencies may change their rules only through compliance with the Alabama Administrative Procedure Act (“the AAPA”), § 41-22-1 et seq., Ala.Code 1975, see § 41-22-2(d), Ala.Code 1975, which generally requires notice and a peri *365 od of public comment before an amendment may be adopted. See §§ 41-22-4 and -5, Ala.Code 1975. However, the PACT board may adopt rules and regulations “either with or without compliance with the Alabama Administrative Procedure Act,” § 16-33C-5(2), and it appears that the PACT board has elected to adopt its rules, procedures, and policies without complying with the AAPA.[19] The public-disclosure statement issued by the PACT board indicates that the PACT board promulgates and amends its rules from time to time as it determines is necessary,[20] without publishing notice of its intent to adopt or amend its rules and without receiving or considering public comment on the proposed rule or rule amendment. Thus, the PACT board acts unilaterally when adopting and amending its rules, procedures, and policies. In referencing the power of the PACT board to “make ... changes to PACT rules, procedures, or policies” in § 16-33C-19, the legislature meant, and only meant, to regulate the PACT board’s power to make unilateral decisions concerning its rules, procedures, and policies under § 16-33C-5.[21] See In re Dorsey, 7 Port. 293 (Ala.1838) (holding that the use of words with a fixed legal significance evidences intent that those words carry that meaning unless context shows otherwise).
The last clause of the first sentence of § 16-33C-19 prohibits the PACT board from making changes to its rules, proee-dures, or policies that “would ... violate the contractual relationship existing between a PACT contract holder and the PACT board.” The word “violation” is defined as “Injury; infringement; breach of right, duty, or law; ... The Act of breaking, infringing or transgressing the law.” Black’s Law Dictionary 1570 (6th ed.1990). “Violate” means, among other things, “[t]o break or disregard (a law or promise, for example).” American Heritage Dictionary of English Language 1921 (4th ed.2001). “Contractual” is defined as “of, relating to, or having the nature of a contract,” American Heritage Dictionary 399, and “relationship” means “a particular type of connection existing between people related or having dealings with one another.” Id. at 1473. The phrase “violate the contractual relationship” suggests a breaking of the interpersonal connection established by a contract. The last clause of the first sentence in § 16-33C-19 prohibits changes that would have the effect of rescinding, voiding, suspending, or terminating existing PACT contracts.
When the first sentence of § 16-33C-19 is properly read, the last clause specifically limits the general power of the PACT board to unilaterally amend its rules, procedures, and policies. Although the first clause confers upon the PACT board the power to make “any financially beneficial changes” to its rules, procedures, and policies, the last clause excepts from that authority the power to make changes to *366 those rules, procedures, and policies that would violate the contractual relationship between the PACT board and a PACT contract holder. The last clause can be read only as a restraint on the rule-making, procedure-making, and policy-making power of the PACT board.
As properly construed, § 16-33C-19 does not address, nor does it limit, the power of the PACT board to enter into contracts with PACT contract holders, such as the settlement agreement at issue here. That power is actually addressed elsewhere. Section 16 — 33C—5(4) bestows upon the PACT board the broad authority “[t]o execute contracts and necessary instruments,” the only limitation being that the contract must be “necessary or convenient to carry out the purposes and provisions of [the Act].”[22] See Rogers v. City of Mobile, 277 Ala. 261, 277, 169 So.2d 282, 297 (1964) (confirming power of state agency to enter into contracts when that authority is conferred by statute). Section 16-33C-7, Ala.Code 1975, lists various items each PACT contract must include, but it does not prescribe the exact terms, conditions, and provisions of those contracts, leaving that “to the sole discretion” of the PACT board. § 16-33C-7(a)(11), Ala.Code 1975. “[Conflicting intentions in the same statute are never to be supposed or so regarded unless forced on the Court by unambiguous language.” Leath v. Wilson, 238 Ala. 577, 579, 192 So. 417, 419 (1939). The last clause of the first sentence of § 16-33C-19 unambiguously limits the power of the PACT board to make unilateral changes to its “rules, procedures, or policies”; it does not unambiguously limit the power of the PACT board to perform any other authorized act, including the power to make bilateral contracts with PACT contract holders under either § 16-33C-5(4) or § 16-33C-7.
The settlement agreement does not run afoul of § 16-33C-19 when that Code section is applied as written. The settlement agreement certainly cannot be considered a unilateral action of the PACT board to amend its rules, procedures, and policies to thereby rescind, void, suspend, or terminate the contractual relationships with any of the PACT contract holders. The settlement agreement did not result from any administrative proceeding; rather, it resulted from a legal proceeding in which the parties, considering the uncertainties involved and weighing their various options, decided to compromise and settle the protracted litigation.[23] The settlement pre *367 serves the contractual relationships between all the class members and the PACT board, leaving it solely to the class members whether to later cancel their contracts in conformity "with the provisions of their contracts controlling cancellation. The settlement agreement simply cannot be characterized as a “change[ ] to PACT rules, procedures, or policies” that “violate[s] the contractual relationship existing between a PACT contract holder and the PACT board.”[24]

B. The Main Opinion Misconstrues § 16-33C-19

The main opinion eschews the literal meaning of § 16-33C-19 by ignoring the first clause of the first sentence. The main opinion does not attempt to interpret the words “mak[ing] ... changes to the PACT rules, procedures, or policies.” This leads the main opinion to construe the language in the last clause — “violate the contractual relationship existing between a PACT contract holder and the PACT board” — as if it existed separate and apart from the first clause. However, when construing a statute, this Court should not focus on isolated words and phrases but should consider them in the context in which they are used. Edwards v. Kia Motors of America, Inc., 8 So.3d 277, 282 (Ala.2008). The last clause cannot be construed independently of the first clause, which it modifies. As shown above, when considered with the first clause, the last clause can be read only as restraining the rule-making, procedure-making, and policy-making power of the PACT board.
The main opinion further misconstrues the last clause of the first sentence in § 16-33C-19 by substituting the words “terms and obligations” for the word “relationship.” 127 So.3d at 356-57 n. 14. In doing so, the main opinion violates at least two other well settled rules of statutory construction.
First and foremost, “ ‘[t]his Court is not at liberty to rewrite [a] statute or to substitute its judgment for that of the legislature.’ ” Willis v. Kincaid, 983 So.2d 1100, 1103 (Ala.2007) (quoting Gowens v. Tys. S., 948 So.2d 513, 522 n. 1 (Ala.2006)). A court can depart from the literal meaning of the words in a statute when the literal meaning would “produce an absurd and unjust result that is clearly inconsistent with the purpose and policy of the statute.” City of Bessemer v. McClain, 957 So.2d *368 1061,1075 (Ala.2006). However, the application of the literal meanings to the terms “violate” and “contractual relationship” does not fail to accomplish any legislative objective or lead to an irrational and inequitable result in clear contravention of the overall purpose of the Act. Although it could be “financially beneficial,” see § 16-33C-19, to the PACT board to unilaterally rescind, void, suspend, or terminate some PACT contracts, the language used in § 16-33C-19 precludes the PACT board from taking such action, which is a legitimate legislative objective. As the main opinion points out, the legislature could have used different language to accomplish that same purpose, 127 So.3d at 356-57 n. 14, but that does not detract from the effectiveness of the language actually used.[25]
Second,
“ ‘[w]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended .... The use of different terms within related statutes generally implies that different meanings were intended.’ 2A Norman Singer, Sutherland on Statutes and Statutory Construction § 46:06, at 194 (6th ed.2000).”
Trott v. Brinks, Inc., 972 So.2d 81, 85 (Ala.2007) (holding that legislature’s use of terms “reimbursement” and “subrogation” in Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975, signaled legislative intent that those words be treated differently). In § 16-33C-5(9), Ala.Code 1975, the legislature authorized the PACT board “[t]o define the terms and conditions of ... PACT contracts.” In § 16-33C-6(b), Ala.Code 1975, the legislature designates the PACT Trust Fund as “the source for payment of PACT Program’s obligations under PACT contracts ” and pledges that the moneys in the PACT Trust Fund will be used “to pay amounts due under the terms of its PACT contracts.” Section 16-33C-7(a), Ala.Code 1975, specifically provides that the PACT contracts “shall include ... the terms and conditions” for payment by PACT contract purchasers, for substitution of beneficiaries, and for any other purpose deemed necessary by the PACT board, as well as terms prescribing “all other rights or obligations of the purchaser and the PACT Program.” The term “contractual relationship” appears only in § 16-33C-19. Therefore, we must presume that the legislature did not intend “contractual relationship” to be synonymous with “contractual terms or obligations” because, if it had so intended, the legislature would have used those more precise terms already used in other sections of the Act.
By substituting the words “terms and obligations” for “relationship,” the main opinion gives an entirely different substantive meaning to § 16-33C-19, effectively amending the statute. “[I]t is not the *369 function of the court to usurp the role of the legislature and to amend statutes under the guise of construction.” Honeycutt v. Employees’ Ret. Sys. of Alabama, 431 So.2d 961, 964 (Ala.1983). It is beyond the judicial power to “revise or correct the language used.” Morris v. McElroy, 23 Ala.App. 96, 99, 122 So. 606, 608 (1929). “[T]he courts are not at liberty ... to read into [a statute] and interpolate words which do not appear in the language enacted by the Legislature.” McCall v. Automatic Voting Machs. Corp., 236 Ala. 10, 13, 180 So. 695, 697 (1938). To hold that § 16-33C-19 actually reads “contractual terms and obligations” in place of “contractual relationship” amounts to “legislating rather than interpreting.” Town of Loxley v. Rosinton Water, Sewer & Fire Prot. Auth., Inc., 376 So.2d 705, 708 (Ala.1979). The legislature deliberately used the term “contractual relationship,” and this Court cannot, without violating the separation-of-powers clause, see Ala. Const. of 1901, § 43, insert into the statute different words with different meanings.

C. The Construction of § 16-33C-19 in the Main Opinion Does Not Invalidate the Settlement Agreement

Even assuming that the language of § 16-33C-19 could validly be transformed to prevent the PACT board from changing its rules, procedures, and policies so as to “violate” the “contractual terms and obligations” of the “existing” PACT contracts, as the main opinion posits, 127 So.3d at 356-57 n. 14, nothing in § 16-33C-19 would preclude the PACT contract holders from waiving any terms in their PACT contracts or from agreeing with the PACT board to a modification of those terms.[26]
A waiver is “the voluntary and intentional surrender or relinquishment of a known right.” Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala.1984). “ “Waiver involves the acts and conduct of only one of the parties....’” Inland Mut. Ins. Co. v. Hightower, 274 Ala. 52, 56, 145 So.2d 422, 425 (1962) (quoting Sovereign Camp, Woodmen of the World v. Newsom, 142 Ark. 132, 219 S.W. 759, 768 (1920)). “Waiver of the right to enforce an agreed term is accomplished unilaterally....” Angus Med. Co. v. Digital Equip. Corp., 173 Ariz. 159, 164, 840 P.2d 1024, 1029 (Ct.App.1992); see also 3A Arthur L. Cor-bin, Corbin on Contracts § 752 (1960) (“[I]t appears that ‘waiver’ consists of the voluntary action of the obligor alone.”). A waiver does not remove, modify, or terminate the contractual terms, but excuses nonperformance of those terms. See generally E. Allan Farnsworth, Contracts § 8.5, at 561 (3d ed.1999). A waiver relinquishes only the right to enforce a contractual provision and does not affect the existence of the underlying right.[27] See Emery v. Progressive Cas. Ins. Co., 49 *370 So.3d 17, 21 (La.Ct.App.2010) (“Waiver occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.” (emphasis added)).
By waiving any rights they may have that are inconsistent with the terms of the settlement, the class members are acting unilaterally. Unlike an offer to make a binding bilateral contract, a waiver does not require any formal acceptance in order to be effective. See Robinson v. Robinson, 961 S.W.2d 292, 298 (Tex.Ct.App.1997) (finding no waiver but recognizing that waiver, as a unilateral act, does not require acceptance by other party). By acknowledging the class members’ waiver, the PACT board does not take any action that could implicate its authority; it certainly would not be unilaterally “changing” “any rules, procedures, or policies.” § 16-33C-19. Moreover, even if the PACT board adopted rules, procedures, and policies consistent with the class members’ waiver, doing so would not “violate the contractual [terms and obligations] existing between a PACT contract holder and the PACT board.” Id. The terms and obligations of the PACT contracts remain intact; the class members only voluntarily and unilaterally agree not to enforce those terms and obligations against the PACT board.[28]
A modification of a contract, on the other hand, requires mutual assent from both parties and, therefore, can be achieved only through bilateral conduct. Angus Med. Co., 173 Ariz. at 164, 840 P.2d at 1029. Section 16-33C-19 prohibits only unilateral actions by the PACT board in adopting or amending rules, procedures, and policies; it does not prohibit bilateral actions involving the PACT board and the PACT contract holders. Moreover, with all due respect to Justice Houston, a modification of a contract is not equivalent to a violation of a contract. 127 So.3d at 362 (Houston, J., concurring specially). Legally speaking, the term “violation of a contract” is synonymous with the term “breach of contract,” which is defined as a “[violation of a contractual obligation by failing to perform one’s own promise, by repudiating it, or by interfering with another party’s performance.” Black’s Law Dictionary 213 (9th ed.2009). A “modification of a contract,” on the other hand, involves the mutual assent of both contracting parties to new or changed contractual terms while the original contract remains executory. See McLemore v. Hyundai Motor Mfg. Alabama, LLC, 7 So.3d 318, 333 (Ala.2008); and Alabama Terminix Co. v. Howell, 276 Ala. 59, 62, 158 So.2d 915, 918 (1963); see also Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 354, 429 N.Y.S.2d 715, 717-18 (1980) (“The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of it intact.”). A contract “may be modified by mutual agreement before a breach without any other consideration *371 than the mutual assent of the parties.... ” Hartford Fire Ins. Co. v. Aaron, 226 Ala. 4B0, 438, 147 So. 628, 630 (1933) (emphasis added). If the parties modify the terms of a contract, performance in compliance with the changed terms is not a breach of the contract, although that performance may not comply with the original terms of the contract. McLemore, 7 So.3d at 332-33 (“Parties may modify the terms of their agreement and ‘if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail.’” (quoting Cavalier Mfg., Inc. v. Clarke, 862 So.2d 634, 641 (Ala. 2003))). Modification clearly alters the terms of a contract, but that alteration is in no sense a breach of that contract; modification is a means of avoiding a breach altogether.
Therefore, even under the main opinion’s revised version of § 16-33C-19, that statute does not preclude the PACT board from entering into an agreement with PACT contract holders to modify existing contract terms and to adopt rules, procedures, and policies consistent with those agreed-upon modifications. It appears from the language in § 16-33C-19 that the legislature did not even contemplate such an agreement. Ex parte Berryhill, 801 So.2d 7, 9-10 (Ala.2001) (“The polestar of statutory construction is to ascertain and give effect to the Legislature’s intent in enacting a statute.”).

D. Summary

The language of § 16-33C-19, applied either literally or as revised by the main opinion, does not dilute the general contractual authority of the PACT board. The PACT board has the contractual power to enter into an enforceable settlement, see Smith v. Tillman, 958 So.2d 333 (Ala. 2006), including the power to agree to all the terms contained in the settlement agreement in this case. The contractual power of the PACT board is not even implicated in regard to the waiver provision, which does not require its acceptance to be valid. Because the settlement does not contravene § 16-33C-19, I find no basis for vacating, on that ground, the judgment approving the settlement agreement.

II. The Objectors Lack Standing

A. The Objectors Did Not Prove an Adverse Modification of Their Contracts

I further note that, even if § 16-33C-19 could be construed as preventing the PACT board from entering into agreements that modify the terms or obligations in existing PACT contracts, the objectors have utterly failed to show that they have been harmed by such a modification. A thorough review of the record shows that Perdue did not even enter her PACT contract into evidence. Although Motlow and Sears represented to the trial court and to this Court that, between them, they had entered into four separate PACT contracts, they attached only one 1992 PACT contract, presumably benefiting Lindsey Motlow, to their written objections. Mot-low has failed to produce evidence showing that the now 20-year-old PACT contract remains executory, i.e., that Lindsey has yet to receive the full benefits set out in the contract and that the PACT board remains obligated to pay, on her behalf, full tuition and fees at current rates. Even assuming that the 1992 PACT contract guaranteed payment of full tuition and fees and remains executory, Motlow has not shown that the PACT board has paid, or vail pay, less than those amounts on Lindsey’s behalf.[29]
*372 An objecting class member may have standing to appeal a judgment approving a class-action settlement, see Devlin v. Scar-delletti 536 U.S. 1, 14, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002),[30] but “[an objector] will only be allowed to appeal that aspect of the [lower court]’s order that affects him [or her].”[31] 536 U.S. at 9 (emphasis added). An individual objector to a class-action settlement may appeal only as to asserted errors in the settlement that, in fact, have injuriously affected his or her rights, not the rights of other class members. See also Rebney v. Wells Fargo Bank, 220 Cal.App.3d 1117, 269 CaLRptr. 844 (1990) (objectors, although class members, lacked standing to contest settlement terms that did not impact objectors but purportedly injured only other class members); National Ass’n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 39 (1st Cir. 2009) (“But a class member other than a named plaintiff is not a representative; that member is individually bound by a class judgment and is free to pursue his own interest on appeal.” (final emphasis added)). Although no Aabama case has directly addressed this question in a class- *373 action context, as a matter of general Alabama law, an individual cannot appeal a judgment on behalf of another, see B.H. v. Marion Cnty. Dep’t of Human Res., 998 So.2d 475, 477 (Ala.Civ.App.2008) (great-aunt had no standing to assert errors in termination of mother’s parental rights), because “[sjtanding ... turns on ‘whether the party has been injured in fact and whether the injury is to a legally protected right,’ ” State v. Property at 2018 Rainbow Dr., 740 So.2d 1025, 1027 (Ala.1999) (quoting Romer v. Board of Cnty. Comm’rs of the Cnty. of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting) (first emphasis added)). In particular, appellate standing depends on whether the judgment complained of has in fact aggrieved the appellant by impairing his or her individual rights. B.H., supra.[32]
The objectors lack standing to complain that the judgment approving the settlement agreement injures other class members.[33] Those class members presumably know what is in their best interests and, if they felt aggrieved by the judgment approving the settlement agreement, they could have filed their own appeals. See generally TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 462 (2d Cir.1982). Having failed to show that their PACT contracts have, in fact, been modified to their detriment, the objectors lack standing to challenge the settlement agreement on the ground that it violates § 16-83C-19. Thus, this Court should not even consider that issue, much less rule in favor of the objectors on that point.

B. Perdue Has Not Proven that the Waiver of § 16-83C-17 Harmed Her

That same standing problem infects Per-due’s argument that the settlement agreement violates § 16-33C-17,[34] which Code section generally prohibits public institutions of higher learning within this State, other than the University of Alabama and Auburn University, from charging
“the PACT plan or a PACT plan contract owner mandatory fees or tuition per credit hour in an amount exceeding the cost of mandatory fees or tuition per credit hour as of September 30, 2009....”
In enacting § 16-33C-17, the legislature plainly intended “to limit the cost of tuition for certain PACT plan participants,” Preamble to Act No. 2010-725, Ala. Acts 2010 (emphasis added), namely, those contract holders whose beneficiaries attend State postsecondary institutions other than the University of Alabama and Auburn University. This Court need not decide whether mandatory waiver of § 16-33C-17 is contrary to the interests of those class members, as Perdue argues, because Per- *374 due has failed to show how that waiver adversely affects her. Perdue does not argue that Anna, her daughter and the beneficiary under Perdue’s PACT contract, is attending, or will attend, one of the schools subject to this settlement term. The evidence presented at the first fairness hearing indicated that this settlement term would apply to only 15% of the PACT contract beneficiaries. Without evidence indicating that Perdue falls within that relatively small class of PACT contract holders who, Perdue argues, would be damaged by the inclusion of that term in the settlement agreement, Perdue does not have standing to object to its purported illegality under § 16-33C-17.

III. The Legislature Has Not Agreed To Fully Fund The PACT Trust Fund

A. The PACT Trust Fund is Underfunded

By vacating the judgment, the main opinion essentially determines that the class members are forbidden by law from working out a plan with the PACT board to avoid a devastating financial outcome. Cf Kinmon v. J.P. King Auction Co., 290 Ala. 323, 325, 276 So.2d 569, 570 (1973) (noting that “[a] citizen of Alabama is free to contract in any way he sees fit” and that “[cjontracting parties are free to modify their contract by mutual assent”). Despite the objectors’ protestations to the eon-trary, the evidence fully supports the trial court’s factual findings regarding the poor financial health of the PACT Trust Fund. Daniel Sherman, an actuary employed by Buck Consultants and retained by the Retirement Systems of Alabama to review the financial condition of the PACT Trust Fund, testified at the first fairness hearing that, as of the end of 2010, the PACT Trust Fund needed an additional infusion of $338 million to fully fund the present value of its future obligations.[35] Young Jacob Boozer III, the current State Treasurer and, in that capacity, the ex officio chairman of the PACT board, testified that, unless the PACT board receives some form of financial relief, the current beneficiaries will exhaust the PACT Trust Fund before 2015. In enacting Act No. 2010-725, the legislature agreed to make annual appropriations for the benefit of the PACT Trust Fund beginning in 2015, but those appropriations will provide only a fraction of the moneys needed to provide tuition and mandatory fees for each contract holder prospectively.[36] Consequently, as the trial court found, “a majority of the class members would recover less (or perhaps nothing) if the proposed Settlement is not approved.”

B. PACT Contracts Are Not Debts of the State

The objectors dispute those dire projections, arguing that they have been fabri *375 cated or that they were not adequately proven at the fairness hearings and that, at any rate, the PACT contracts are debts of the State, which the State has, in essence, guaranteed. As shown above, the first argument is totally without merit. The second argument also fails because the contractual obligations in the PACT contracts are not debts of the State for which the legislature has ensured payment.
The original act, Act No. 89-862, Ala. Acts 1989, established the PACT Trust Fund in former § 16-33C-6(a), Ala.Code 1975, to consist of “[p]ayments received by the board from purchasers on behalf of qualified beneficiaries or from any other source, public or private.” Former § 16-33C-6(c), Ala.Code 1975. The assets of the PACT Trust Fund were considered “public funds of the state” that could be pooled with other state funds for investment purposes. Former § 16-33C-6(d), Ala.Code 1975. The original act further provided that,
“[i]n order to provide funds to enable the trust to pay all amounts that shall be due under prepaid tuition contracts, there is hereby irrevocably pledged to that purpose and hereby appropriated from the trust fund such moneys as shall be necessary to pay all amounts that shall be due under prepaid tuition contracts at any time. In order to carry out the said appropriation and pledge, in each fiscal year the board shall, as provided in subsection (f) above, determine the amount of the future obligations of the trust fund under prepaid tuition contracts by any appropriate actuarial method. After that determination has been made, all moneys on deposit in the trust fund up to and including the amount of such future obligations shall remain on deposit in the trust fund and shall be subject to the aforesaid appropriation and pledge.”
Former § 16-33C-6(h), Ala.Code 1975.
From its plain terms, the original act did not obligate the State to fund the PACT Trust Fund.[37] Former § 16-33C-6(c) provided that the PACT Trust Fund would consist of any payments received by the PACT board from, among others, “public” sources, but nothing in the law obliged the State to provide any funding to the PACT Trust Fund. The funds deposited in the PACT Trust Fund did become “funds of the state,” but that designation did not require the State to replenish those funds in the event they declined below the amount necessary to pay all PACT contracts. More pointedly, former § 16-33C-6(h) provided that payment of “all amounts due” under PACT contracts would come exclusively from the PACT Trust Fund, not from any other public source.
Effective May 9, 2001, see Act No. 2001-427, § 1, p. 544, Ala. Acts 2001, the legislature amended the original act to state that “[a] PACT contract and any other contract entered into by or on behalf of the [PACT Trust Fund], does not constitute a debt or obligation of the state.... ” Former § 16-33C-6(b), Ala.Code 1975. When the legislature again amended the original act in 2010, it retained that clause. See § 16-33C-6(b), Ala.Code 1975, as amended by Ala. Acts 2010, Act. No. 2010-725.[38] That *376 language only emphasizes the legislative intent that any liabilities arising from PACT contracts belong solely to the PACT Trust Fund and not to the State in general. Thus, in 2010, when the legislature appropriated public funds in order to bolster the PACT Trust Fund, it was not acting out of any legal obligation. Its largesse cannot, by opinions of executive officials or otherwise,[39] be transformed into a continuing legal duty to fully fund the PACT Trust Fund.

C. § 16-33C-16(b) Does Not Guarantee Full Funding

Motlow and Sears interpret the language in § 16-33C-16(b), Ala.Code 1975, as establishing that the PACT Trust Fund is, and always will be, 100% fully funded by state funds as a matter of law so that it cannot be proven as a matter of fact that the State will not fully fund the PACT Trust Fund. That interpretation seriously overstates the meaning of the language employed in § 16-33C-16(b). Section 16-33C-16(b) provides that
“[t]hese appropriations [contained in § 16-33C-16(a) ], along with the appropriations made in Section 16-33C-14 and Section 16-33C-15, [Ala.Code 1975,] will make the PACT Program 100 percent fully funded, according to the actuarial professional retained'by the PACT board.”
(Emphasis added.) Section 16-33C-16(b) explains only that the legislature had received information indicating the amount needed to fully fund the PACT Trust Fund at the time the 2010 amendments became effective and that the legislature had relied upon that information in determining the amount of financial aid it would appropriate to fulfill that need. Nowhere does Act No. 2010-725 provide that, should the amount allocated prove insufficient, the legislature was committing itself to additional funding in order to guarantee the contractual obligations of the PACT board.[40]
According to the testimony at the fairness hearings, absent the settlement agreement, the PACT Trust Fund needs $338 million, in addition to the approximately $548 million already appropriated by the legislature, to fully fund its current liabilities. That amount could increase in the future depending on the rate of tuition and fee increases and the rate of investment returns realized by the PACT Trust Fund. In §§ 16-33C-14, -15, and -16, the legislature appropriated funds for the PACT Trust Fund from the Education Trust Fund, which is the primary source of funding for statewide public education. See Ala. Const, of 1901, Art. XIV, § 260. In effect, the objectors argue that the legislature diverted additional hundreds of millions of dollars from other public educational institutions attended by hundreds of thousands of Alabama students, if not more, in order to ensure the viability of the PACT Trust Fund for the benefit of *377 30,000 PACT contact holders and their beneficiaries.
First, in Act No. 2010-725, the legislature only “appropriated” funds to support the PACT Trust Fund. A legislative appropriation of funds is not a guarantee of funding. Under § 41-4-90, Ala.Code 1975, with some exceptions not applicable here,
“[a]ll appropriations are hereby declared to be maximum, conditional and proportionate appropriations, the purpose being to make appropriations payable in full in the amounts named only in the event that the estimated budget resources during each budget year of the period are sufficient to pay all of the appropriations for such year in full.”
As explained in Siegelman v. Alabama Association of School Boards, 819 So.2d 568 (Ala.2001):
“ ‘[Section 41-4-90] recognizes that the Legislature can make appropriations in such amounts as it deems proper for state agencies but that these appropriations are conditional in the sense of being paid in full “only in the event that the estimated budget resources during each budget year of the period are sufficient to pay all of the appropriations for each year in full.” ’ ”
819 So.2d at 579 (quoting brief of Alabama Association of School Boards). Consequently, by appropriating approximately $548 million to aid the PACT Trust Fund, the legislature did not, by any means, guarantee that those payments would be made as scheduled. Otherwise, the legislature would have incurred a debt in violation of Ala. Const, of 1901, Art. XI, § 213 (“[N]o new debt shall be created against, or incurred by the state, or its authority except to repel invasion or suppress insurrection. ...”). See John E, Ballenger Constr. Co. v. State Bd. of Adjustment, 234 Ala. 377, 380, 175 So. 387, 389 (1937).[41]
Second, even if the legislature could guarantee the payment of all PACT contracts, such a guarantee must be shown clearly and unequivocally from the terms of the appropriating statute. Shamburger v. Tierney, 257 S.W.2d 592, 593 (Ky.1953) (“It is a fundamental rule of construction that statutes authorizing the appropriation of public funds will not be extended beyond the natural and fair meaning of the words used.”). Outside the legislative context,
“[f]or an instrument to be enforceable as a guaranty, it must show, with reasonable clarity, an intent to be liable on an obligation in case of default by the primary obligor, and the agreement must contain the express conditions of that liability and the obligations of each party within the four corners of the document. That undertaking must be clear and explicit.”
38 Am.Jur.2d Guaranty § 5 (2012). No good reason exists to treat statutes any differently. Any promise undertaken by the legislature to “guarantee” the debts of the PACT Trust Fund should be “clear and explicit,” especially considering the monumental amount at issue. See California State Employees’ Ass’n v. Cory, 123 Cal.App.3d 888, 896,176 Cal.Rptr. 904, 909 (1981) (refusing to find appropriation of $18 million in interest, “hardly a small-change operating budget item,” without *378 extant statute expressing intent for appropriation). Section 41-4-40 provides that, when sufficient funds are available, appropriations are payable “in the amounts named.” In Act No. 2010-725, the legislature specified the exact amounts it was appropriating for the purpose of supporting the PACT Trust Fund.[42] The legislature did not indicate that any additional amounts would be, or could be, appropriated. Nothing in the Act clearly and explicitly requires any further public funding of the PACT Trust Fund or provides for any payment of PACT contracts from any source other than the PACT Trust Fund, as the trial court correctly found. (“The Court finds that the PACT Trust Fund constitutes the sole funding source to provide such benefits.” (trial court’s order, p. ¾).
The legislature erased any doubt about that conclusion when, as Boozer testified, it refused his requests for additional funding beyond the $547,629,100 appropriated under Act No. 2010-725. The clear expression of the legislature as to the amount of public funds to be committed to the PACT Trust Fund cannot be overcome by any statutory language allegedly implying otherwise. See Hale v. Randolph Cnty. Comm’n, 423 So.2d 893, 896 (Ala.Civ. App.1982) (rejecting argument by deputy sheriffs that county commission must pay all overtime incurred by them because that “would be to approve an open-ended appropriation for [that] purpose,” which would not “be the law”). A court cannot infer an additional legislative appropriation from a statute that does not explicitly provide such. See California State Employees’ Ass’n v. Cory, supra (holding that court could not infer that legislature intended to appropriate funds to cover interest from statute appropriating only principal amount).

*379
D. This Court Cannot Mandate Legislative Funding

In order to agree with the objectors on this point, this Court would have to mandate that the legislature appropriate funds for the purpose of paying full tuition and fees to PACT contract holders, regardless of the amount needed. Article IV, § 71, Ala. Const, of 1901, provides that “[n]o money shall be paid out by the treasury except upon appropriation by law....” “ ‘The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature.’ ” Riley v. Joint Fiscal Comm, of Alabama Legislature, 26 So.3d 1150, 1154 (Ala.2009) (quoting Morgan Cnty. Comm’n v. Powell, 292 Ala. 300, 306, 293 So.2d 830, 834 (1974), citing in turn Abramson v. Hard, 229 Ala. 2, 155 So. 590 (1934)). Article III, § 43, Ala. Const, of 1901, provides, in pertinent part, that “the judicial shall never exercise the legislative and executive powers, or either of them.” Hence, “the judiciary may not encroach upon power given to the Legislature, and judicial officials cannot order legislative officials to take a particular policy course.” Ex parte James, 713 So.2d 869, 909 (Ala. 1997) (Hooper, C.J., dissenting). The courts “do not have the authority to tell the Legislature ... in what fashion it must spend public funds in a particular area.” Ex parte James, 836 So.2d 813, 868 (Ala. 2002) (Moore, C.J., concurring in the result in part and dissenting in part). “It is therefore not within the sphere of the judicial branch to determine what appropriations are to be made.... ” Sparks v. Parker, 368 So.2d 528, 531 (Ala.1979).

E. Summary

The legislature has not guaranteed the obligations of the PACT Trust Fund, and the legislature has not appropriated or agreed to appropriate any funds for the purpose of paying PACT contracts other than those explicitly set out in §§ 16-33C-14, -15, and -16. The objectors are simply incorrect in arguing that the legislature has resolved to take responsibility for PACT funding and to supply any funds necessary to assure PACT contract holders full tuition and fees. Their argument, therefore, provides no basis for vacating the judgment approving the settlement agreement.

IV. The Objectors Have Not Presented Any Other Grounds for Vacating the Judgment

A. This Court Cannot Consider Most of the Objectors’ Remaining Arguments

The objectors make numerous other arguments in an effort to secure a reversal of the judgment. However, the objectors lack standing to assert some of those arguments;[43] many other arguments cannot be *380 considered on appeal because they are being raised for the first time;[44] and most of their other objections can only be described as vague, undeveloped assertions without adequate supportive legal argument.[45] See K.D.H. v. T.L.H., 3 So.3d 894, 899 n. 2 (Ala.Civ.App.2008) (refusing to consider argument that is “vague and undeveloped”); and Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007) (holding that, under Rule 28(a)(10), Ala. R.App. P., an appellate court will not consider arguments without citation to legal authority or based on un-delineated general propositions of law). As has already been shown, those truly substantive arguments as to the legal validity of the settlement lack any merit. The objectors’ remaining arguments as to the alleged collusive manner in which the parties reached the settlement, the alleged improper methods used by the trial court to approve the settlement agreement, and the purported exorbitant award of attorney fees[46] do not warrant any serious discussion, except to say that the trial court did not commit any reversible error in conducting its proceedings, see Grayson v. State, 824 So.2d 804, 841 (Ala.Crim.App. 1999) (holding that circuit court has inherent authority to control the proceedings before it to ensure proper decorum), in finding that the terms of the settlement agreement were reached in an arm’s-length transaction, Ingram v. Coca-Cola Co., 200 F.R.D. 685, 693 (N.D.Ga.2001) (holding that, in determining whether settlement resulted from collusion, court must examine the negotiating process to determine “whether the compromise was the result of arms-length bargaining between the parties”), in concluding that the settlement agreement was fair, reasonable, and adequate, see Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir.1984) (holding that, to be approved, class-action settlements must be fair, adequate, and reasonable), and in approving the payment of reasonable attorney fees from the PACT Trust Fund. See Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1265 (D.C.Cir.1993) (holding that attorney fees can be paid out of “limited fund”).

*381
B. The Objectors’ Argument that the Release is Overbroad is Without Merit

Perhaps the only objection that deserves further consideration concerns the argument that the settlement agreement releases the PACT board from any further responsibility for properly managing the PACT Trust Fund, although that argument does not warrant vacating the trial court’s judgment.
The settlement agreement provides that all class members release the PACT board members and their representatives from all claims that could have been brought in this action, as well as
“any and all other claims relating to the operation and administration of the PACT Program and/or the PACT Trust Fund, including (but not limited to) the payments/non-payment of tuition and fees and all claims available under the Uniform Trust Code as codified at Ala. Code § 19-3B-101 et seq. other than the obligations embodied in this Settlement and any judgment entered by this court approving or adopting this Settlement.”
(Emphasis added.)
Section “F” of the settlement agreement provides that any future receipts will be deposited in the PACT Trust Fund
“to be administered in a manner which is deemed by the PACT Board at its discretion to fulfill the purposes of the PACT Program and which is consistent with the duties and obligations of the Board.”
(Emphasis added.) Section “K” of the settlement agreement further provides that, except for those specific provisions waived by the class members, the PACT board remains subject to the Act. Those two provisions require the PACT board to comply with existing statutes regarding the management of the PACT Trust Fund.
Section 16-33C-4.1, Ala.Code 1975, provides, in pertinent part, that
“all members of the PACT board have the fiduciary responsibility to devise and implement an investment strategy designed to maximize investment returns in a manner that correlates with future projected benefit payouts.”
Section 16-33C-6(d) also provides, in pertinent part:
“In acquiring, investing, reinvesting, exchanging, retaining, selling, and managing property of the PACT Trust Fund, the PACT board and any person or investment manager to whom the PACT board delegates any of its investment authority shall exercise the judgment and care under the circumstances then prevailing which persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but to permanent disposition of funds, considering the probable income as well as the safety of their capital. When acting within this standard of care, no PACT board member, or any person or investment manager to whom the PACT board delegates any of its investment authority, shall be held personally liable for losses suffered by the PACT Program on investments made pursuant to this chapter. No PACT board member shall be held personally liable for any losses, damages, or claims which have arisen or may arise from or are related to any act or omission of the board member taken in service as a member of the board or as a trustee, so long as the board member acted in good faith.”
Those statutes require the members of the PACT board to exercise fiduciary responsibilities when managing the PACT Trust Fund, subject to liability for acting in bad faith when deviating from the standard of care set out in § 16-33C-6(d).
*382 By stating that the release applies to claims “other than the obligations embodied in this Settlement and any judgment entered by this court approving or adopting this settlement” and by incorporating by reference the terms of §§ 16-33C-4.1 and -6, the settlement agreement preserves any claims based on future breaches of fiduciary duty. In the first fairness hearing, the trial court stated that the settlement agreement would not be approved if it included any release “shielding anybody from any future mismanagement.” Because the settlement agreement does not absolve members of the PACT board of liability for future breaches of fiduciary duty, the trial court did not renege on that stated intention when it approved the settlement agreement.
In addition, the release language also expressly preserves any claims the class members may have in the event of a default of the obligations set out in the settlement agreement. Thus, in the event the PACT board fails to pay out tuition and fees in accordance with the terms of the settlement agreement, the class members have not released any claims arising out of that breach. The settlement agreement does not allow the PACT board to shirk its settlement obligations without legal consequence, and the trial court did not err on that ground in approving the settlement agreement.

V. Conclusion

The settlement agreement provides for an equitable distribution of the PACT Trust Fund that will significantly increase the probability that all class members will receive at least some economic benefit from the PACT contracts. The settlement was within the authority of the PACT board and the class members to make. Those objections properly raised and argued by the objectors do not justify a vacation of the judgment approving the settlement agreement. For the foregoing reasons, I respectfully dissent.

. The AAPA does not contain any rules regarding the administration of the PACT program.

. This Court may take judicial notice of the rules of the PACT board. See Broadway v. Alabama Dry Dock & Shipbuilding Co., 246 Ala. 201, 212, 20 So.2d 41, 51 (1944) (opinion on rehearing). As referenced by the PACT board’s rules, on the date this opinion was released the public-disclosure statement issued by the PACT board in December 2010 could be found at http://www.treasury. alabama.gov/pacVprogram_docs.htm.

.The last sentence of § 16-33C-19 provides: “Any such changes made prior to July 1, 2011, require the prior approval of the Legislative Council.” The judgment approving the settlement agreement was entered on July 27, 2011; hence, any agreed changes to the rules, procedures, and policies of the PACT board would have taken effect after July 1, 2011.

. The objectors do not cite § 16-33C-5(4) or argue that the settlement agreement exceeds any contractual power conferred on the PACT board by that statute. "Issues not argued in a party's brief are waived.” Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1167 (Ala.2003).

. I recognize that the objectors do not want to waive their rights or to modify their contracts, but "all ordinary class members are bound by the deal struck by their named representatives in the event the court determines that they were adequately and fairly represented during the course of the negotiations.” Grimes v. Vitalink Commons Corp., 17 F.3d 1553, 1558 (3d Cir.1994). Although the objectors charge that the parties colluded during the settlement negotiations, the record shows that the settlement resulted from a mediation conducted by retired Associate Justice Bernard Harwood, who confirmed by deposition that the parties negotiated at arm’s length. The record further indicates that the named class representatives adequately and fairly represented all the class members, including the objectors, and that the settlement benefits the class as a whole. Thus, the fact that the objectors do not subjectively consent to a waiver or modification of their contracts, 127 So.3d at 364, or that the class members have not unanimously concurred to the terms of the settlement agreement, 127 So.3d at 359 n. 17, does not mean that all class members, including the objectors, are not bound by this adequate, fair, and reasonable settlement agreement, nor does their dissent from the settlement alone vitiate the class's waiver and *367 modification agreement, see Austin v. Pennsylvania Dep't of Corr., 876 F.Supp. 1437, 1458 (E.D.Pa.1995) (“[T]he mere fact that there is opposition, even from class representatives, does not necessitate rejection of the settlement.”), as the main opinion seems to indicate. 127 So.3d at 355. "[A]ll class actions are brought to affect the rights of class members.” Carlough v. Amchem Prods., Inc., 834 F.Supp. 1437, 1465 (E.D.Pa.1993). I cannot locate any legal authority, and the main opinion does not cite any, see 127 So.3d at 353, supporting the proposition that a fair, adequate, and reasonable class-action settlement falling under Rule 23(b)(1) and (b)(2) cannot mandate terms to which all class members do not personally agree. If the law required such unanimous consent, then no class-action settlement could be reached or be approved over even one objection. Cf. TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 462 (2d Cir.1982) (holding that a class-action settlement can be approved if manifestly reasonable even if those class members holding a majority interest object to its terms).

. Any opinion by a layperson that the settlement agreement violates the law of Alabama has no bearing on the determination whether the settlement, in fact, violates § 16-33C-19, which is a question for this Court. See Phillips v. Harris, 643 So.2d 974, 976 (Ala.1994) ("[A] witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition.”). Thus, I am not persuaded that the settlement is “clearly contrary to state law” based on any testimony in the record to that effect. See 127 So.3d at 358 and n. 16.

. The same criticism could be leveled at the main opinion’s construction of § 16-33C-19. If the legislature had intended to leave the "terms or obligations” of the PACT contracts inviolate, unmodifiable, and nonwaivable, it could have clearly and explicitly stated as much. See, e.g., §§ 7-2-201 and 7-2A-201, Ala.Code 1975 (making certain contracts “not enforceable” under Statute of Frauds); § 8-1 — 1(a), Ala.Code 1975 ("Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.”); § 26—17—601(b), Ala.Code 1975 (making stipulations in any agreement that seeks to bar paternity actions "not enforceable”); § 8-20-14, Ala.Code 1975 (precluding parties from modifying or superseding Motor Vehicle Franchise Act by "a choice of law clause in any franchise or dealer agreement, waiver, or other written instrument”); § 7-9A-405(a), Ala.Code 1975 (limiting effectiveness of modification of assigned contract); and § 10A-9-1.10, Ala.Code 1975 (listing "nonwaivable provisions” of partnership agreements).

. At one point, the main opinion indicates that the settlement agreement constitutes "a mutually agreed upon reformation of the ‘contractual relationship.' ” 127 So.3d at 359. However, reformation is an equitable remedy by which a court reforms a contract so as to accurately express the terms to which the parties originally agreed and differs from a modification by which the parties agree to change the original terms of the contract. See Federated Guar. Life Ins. Co. v. Painter, 360 So.2d 309 (Ala. 1978).

. The legislature signaled its knowledge of the distinction between a waiver and a modification in § 35-9A-143, Ala.Code 1975 ("If the court, as a matter of law, finds: ... a settlement in which a party waives or agrees to forego [sic] a claim or right under this chapter or under a rental agreement was unconscionable when made, the court may refuse to enforce the settlement, enforce the remainder of the settlement without the unconscionable provision, or limit the application of any unconscionable provision to avoid an unconscionable result.”), and in §§ 7-2-209 and 7-2A-208, Ala.Code 1975 (distinguishing between waiver, rescission, and modification).

. In her brief to this Court, Perdue argues that the class could not waive any of its statutory rights under the Act because such a waiver contravenes public policy. Perdue did not argue that point in the trial court, and this Court cannot consider that argument for the first time on appeal. Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992); see also Disch v. Hicks, 900 So.2d 399, 404-05 (Ala. 2004) (applying rule to objector’s appeal, but finding that argument had been adequately preserved); and In re Philadelphia Stock Exch., Inc., 945 A.2d 1123, 1134-35 (Del. 2008) (refusing to consider issues raised by objectors for first time on appeal). At any rate, that argument lacks merit because the waiver does not violate § 16-33C-19 or any public policy favoring college education.

. The record indicates that, as a result of the period of their postsecondary enrollment, some beneficiaries of PACT contracts will receive full tuition and fees without modifica *372 tion. The record does not indicate that Lindsey falls outside that category of beneficiaries.

. The appellees jointly moved to dismiss Per-due’s appeal, asserting that she had released any claims that would support her appeal and, thus, that she lacked standing. However, the release upon which the appellees rely was superseded by a judgment of the Montgomery Circuit Court that limited the release to claims "aris[ing] from the factual allegations made a basis of the [lawsuit referred to in the release].” See ArvinMeritor, Inc. v. Johnson, 68 So.3d 870, 875 (Ala.Civ.App. 2011). So limited, the release does not affect Perdue's status as a class member or her general right as an objector to appeal.

. As the main opinion correctly observes, Devlin continues by stating that an objector can appeal "the District Court’s decision to disregard his objections.” 536 U.S. at 9. In Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1183 n. 1 (10th Cir.2002), the United States Court of Appeals for the Tenth Circuit held that this language allowed objectors to a class-action settlement to appeal based on any objections they had raised in the district court, concluding that those objections "were directed at the entire settlement” and that there was "no practical way to separate Objectors’ individual interests from those of the other class members without upsetting the entire settlement fund.” Id. The federal district court for the Southern District of Florida refused to follow Rutter, explaining:
"In Devlin, the Supreme Court clearly stated that although the petitioner could appeal the district court’s final approval of the class settlement, the 'petitioner will only be allowed to appeal that aspect of the District Court’s order that affects him ’ (emphasis added). Further, I note that although the Eleventh Circuit did not specifically address the issue of the scope of the appeal by an objector to a final order approving a settlement in a class action, the Eleventh Circuit, in interpreting Devlin, found that the objectors were not allowed to appeal such a final order because they were not seeking to 'protect their own property, their own allotment from an award or settlement or any other cognizable legal right or interest.’ \AAL High Yield Bond Fund v. Deloitte & Touche LLP, 361 F.3d 1305, 1305 (11th Cir.2004).] As the express language in Dev-lin limits the right of an objector to appeal the district court’s order to the extent that it affects the objector personally and the Eleventh Circuit’s conclusion in AAL High Yield Bond that an objector who was not specifically challenging his allotment from the class action settlement, I conclude Westh-eimer should only be allowed to appeal this Order to the extent that it affects him personally.”
Allapattah Serv., Inc. v. Exxon Corp., (No. 91-0986-CIV, Apr. 7, 2006) (S.D.Fla.2006) (not reported in F.Supp.2d).
I agree with the district court that Devlin intended that an objector may challenge on appeal only those aspects of a settlement that adversely affect the objector personally. To the extent that the main opinion relies on any contradictory federal circuit court cases predating Devlin, 127 So.3d at 361, I do not find those cases persuasive.

. The main opinion cites cases in which judgments in class-action settlements have been reversed in their entirety based on errors raised by individual objectors. 127 So.3d at 360. I agree that if the objectors in this case proved reversible error, then the judgment would be vacated as to all class members. However, I do not agree that the objectors have standing to raise issues affecting only other class members or that they can win a vacation of the judgment through those arguments.

. In the trial court, Perdue purported to object on behalf of, among others, the PACT Trust Fund itself. However, she appealed only on behalf of herself and as next friend and guardian of Anna K. Perdue, and Perdue has expressly disavowed that she is asserting the rights of any other person or entity.

.Motlow and Sears did not join in that argument. Because it vacates the judgment on other grounds, the main opinion does not address this aspect of Perdue’s appeal. I nevertheless must address the issue because I disagree with the main opinion’s disposition of the appeal.

. As part of its statutory duties, the PACT board is required to submit an annual report to the Governor of Alabama detailing the financial state of the PACT program. See § 16-33C-8(2), Ala.Code 1975. That public record, of which this Court may take judicial notice, see Broadway v. Alabama Dry Dock & Shipbuilding Co., 246 Ala. 201, 212, 20 So.2d 41, 51 (1944) (opinion on rehearing) (recognizing that the Alabama Supreme Court takes judicial notice of the annual report to the Governor of the director of the Department of Industrial Relations), indicates that, on March 10, 2011, the PACT board reported exactly the same financial information to the Governor that it presented at the fairness hearings. On the date this opinion was released, a copy of the 2011 PACT Annual Report could be found at http://www.treasury.alabama.gov/pact/ additionaLinfo.htm.

. The State Treasurer testified that the PACT board currently pays out $125 million per year in tuition and fees. The legislature appropriated $23,558,000 for 2015, see § 16-33C — 14(a)(1), Ala.Code 1975, which is less than 25% of the current payout figure. The appropriations increase annually, but none of them approximate the current $125 million payout rate. See §§ 16-33C-14, -15, and -16.

. In their brief to this Court, Motlow and Sears assert that "the state law that created the PACT program prior to 2001 indicated that the PACT program was a 'guaranteed' fund." They do not cite any portion of the original act that contains that alleged guarantee. See Rule 28(a)(10), Ala. R.App. P. (requiring citation to legal authority when arguing point of law).

. In their brief to this Court, Motlow and Sears claim that, after the original act was passed, "[l]ater, amendments were made to the statute that the legislature and representa *376 tives of the State of Alabama continued to interpret and promote the PACT program as a guaranteed fund." Again, they do not cite any part of the record or any part of the legislation upon which they rely in making that assertion.

. In a news report attached to the written objection filed by Motlow and Sears, the reporter states that, after signing Act No. 2010-725 into law, "Governor Riley said he believed the state had a moral and legal obligation to make sure the PACT Program was fiscally sound."

. Although the main opinion states that the legislature has undertaken "to remedy the financial problems facing the PACT program,” 127 So.3d at 360, that language should not be read as holding that the legislature has agreed to, or will, allocate moneys for the PACT Trust Fund beyond those amounts set out in Act No. 2010-725.

. This Court should construe a statute to avoid conflicts with constitutional provisions, if possible. City of Homewood v. Bharat, LLC, 931 So.2d 697, 701 (Ala.2005); see also James v. Todd, 267 Ala. 495, 505, 103 So.2d 19, 27 (1957) (noting that “where a statute is capable of two constructions, one which renders it [constitutionally] valid and the other invalid, the construction which will uphold its validity must be adopted”). Hence, this Court cannot construe § 16-33C-16(b) as creating an unconstitutional debt when that statute can be easily construed otherwise.

. Section 16-33C-14(a) provides:
"(a) There is annually appropriated from the Education Trust Fund to the Trust Fund of the Prepaid Affordable College Tuition (PACT) Program the following amounts in the following fiscal years:
"(1) For the fiscal year ending 2015— $23,558,000
“(2) For the fiscal year ending 2016— $23,952,000
"(3) For the fiscal year ending 2017— $22,622,000
"(4) For the fiscal year ending 2018— $41,783,000
"(5) For the fiscal year ending 2019— $42,539,000
“(6) For the fiscal year ending 2020— $81,646,000.”
Section 16-33C-15(a) provides:
"(a) In addition to the appropriations made in Section 16-33C-14, there is also annually appropriated from the Education Trust Fund to the PACT Trust Fund the following amounts in the following fiscal years:
"(1) For the fiscal year ending 2020— $7,092,300
“(2) For the fiscal year ending 2021— $31,881,600
"(3) For the fiscal year ending 2022— $32,181,600
"(4) For the fiscal year ending 2023'— $33,494,400
"(5) For the fiscal year ending 2024— $33,728,700
"(6) For the fiscal year ending 2025— $38,449,500
"(7) For the fiscal year ending 2026-— $39,201,000
"(8) For the fiscal year ending 2027— $32,500,000.”
Section 16-33C-16(a) provides:
"(a) In addition to the appropriations made in Section 16-33C-14 and Section 16-33C-15, there is annually appropriated from the Education Trust Fund to the PACT Trust Fund the following amounts in the following fiscal years:
"(1) For the fiscal year ending 2016— $10,000,000
“(2) For the fiscal year ending 2017— $20,000,000
"(3) For the fiscal year ending 2018— $20,000,000
"(4) For the fiscal year ending 2019— $13,000,000.”

. Perdue argues that the class action should have been dismissed under § 6-5-440, Ala. Code 1975, but that defense belongs solely to the PACT board, see Ex parte J.E. Estes Wood Co., 42 So.3d 104, 110-11 (Ala.2010), and cannot be raised by Perdue. See also Ex parte State Mut. Ins. Co., 715 So.2d 207, 220 (Ala. 1997) (plurality opinion) (holding that § 6-5-440 does not apply to class actions). Perdue also lacks standing to contest the allegedly disparate treatment between class members because she did not present any evidence indicating that she is in the allegedly adversely affected subclass.
Motlow and Sears contend that the notice did not adequately and timely inform class members of the terms of the settlement agreement. They clearly read and understood the settlement agreement and filed written objections within the time parameters established by the trial court; therefore, they cannot assert any objections based on lack of sufficient notice. Likewise, they do not have standing to contest any alleged failure to send copies of the notice to the beneficiaries of the PACT contracts because they received notice and have appealed solely as PACT contract holders.

. At no point did Perdue argue in the trial court that the trial court, when deciding the adequacy, fairness, and reasonableness of the settlement agreement, erred in failing to consider the likelihood of the success of the claims and counterclaims at stake in the class action, the stage of the proceedings at which the settlement was achieved, and the complexity, expense, and duration of the litigation, the substance and amount of opposition to the settlement agreement, and whether the named plaintiffs are the only class members to receive monetary relief or are to receive relief that is disproportionately large. Mot-low and Sears did not argue below that the settlement agreement unconstitutionally impairs contractual obligations or that the trial court failed to perform a proper rigorous analysis before certifying the class.

. That description applies to Perdue’s arguments that the law prohibits prospective releases; that a class-action settlement cannot be approved unless it resolves the claims contained in the pleadings; and that attorney fees cannot be paid in an up-front lump sum. Motlow and Sears also did not comply with Rule 28(a)(10), Ala. R.App. P., when arguing that a release of monetary claims in a Rule 23(b)(2), Ala. R. Civ. P., class-action settlement is improper and that 20 days’ notice of the fairness hearings was legally insufficient.

.I do agree with the main opinion that the order allowing immediate payment of the attorney fees appears to conflict with the term of the settlement agreement preventing any action from being taken to implement the settlement agreement until after a timely appeal has been dismissed or the judgment has been affirmed. 127 So.3d at 355 n. 13. However, the judgment approving the settlement agreement modified that term to require that the settlement take place immediately (trial court’s order, p. 353), so I find that the trial court did not err in ordering the payment of the attorney fees.